Chief Judge Fuld.
Mrs. Eileen M. Seiter was killed when the American Airlines plane on which she was a passenger crashed *164 as it approached La Guardia Airport on February 3, 1959. Her administrators have brought this action for wrongful death and American has raised as an affirmative defense the limitation of liability provisions of the Warsaw Convention (49 U. S. Stat., pt. 2, p. 3000, hereinafter referred to as the “ Convention ”). Two questions are presented by this appeal: Was the final leg of the flight—from Chicago to New York City—to be deemed ‘ ‘ international transportation ’ ’ for purposes of the Convention so as to render it applicable to the present action and, if it was, had the carrier sufficiently complied with the Convention’s notice requirements to permit it to limit its liability?
Mrs. Seiter had purchased an airline ticket for a round trip between New York City and Vancouver, Canada. The ticket-scheduled her on successive flights of Northwest Airlines and United Airlines with stopovers at Seattle (west and eastbound) and at Chicago (eastbound). On the face of the ticket, below the name of the passenger, the following footnote appeared in exceedingly small, almost unreadable (4% point) print:
“ Carriage/Transportation under this Passenger Ticket and Baggage Check, hereinafter called ‘ ticket ’, is subject to the rules relating to liability established by the Convention for the Unification of Certain Rules relating to International Carriage/Transportation by Air signed at Warsaw, October 12, 1929, if such Carriage/Transportation is ‘ international carriage/transportation ’ as defined by said Convention.”[1]
*165 Mrs. Seiter arrived in Vancouver on January 26, 1959, as scheduled, hut, on February 3, when she was ticketed to return to New York, she discovered that all flights out of Vancouver had been cancelled because of inclement weather. Instead of waiting for the next available flight, she proceeded to Seattle by bus, obtaining a refund check from Northwest Airlines for that portion of her journey when she reached that city.
Mrs. Seiter reached Seattle in time to permit her to take off on the Northwest flight to Chicago for which she had been originally scheduled. Reaching Chicago too late to make her scheduled connection to New York City, she presented her ticket to Northwest Airlines and received a new one for passage on an American Airlines flight to La Guardia Airport. The new ticket—under the heading “ Complete Routing This Ticket and Conjunction Tioket(s) ”—specified the origin and destination as “NY” and expressly recited that it was “issued in exchange por ” the original ticket, the fare being listed at the figure which had initially been paid for the entire round trip. Mrs. Seiter boarded respondent American’s, aircraft which, as stated above, crashed while attempting to make a landing at La Guardia.
The present action, for wrongful death, was brought against American Airlines and two other defendants—one the manufacturer of an assertedly defective altimeter and the other the assembler of the aircraft. We are, however, concerned solely with the sufficiency of American’s (third) affirmative defense which asserts an “ exemption from and limitation of liability in accordance with all of the applicable provisions of said Convention ”. The court at .Special Term upheld that defense, denying the plaintiffs’ motion to dismiss it, and the Appellate Division unanimously affirmed Special Term’s order, granting leave to appeal on a certified question.
As both courts below recognized, answer to the underlying question—whether the flight from Chicago to New York City was “international transportation” under the Convention— depends upon the nature of the contract between the carrier and *166 its passenger.[2] When it provides for ‘ ‘ international ’ ’ transportation, ‘ ‘ whether or not there be a break in the transportation ” (art. 1, subd. [2]), all flights taken under it are governed by the Convention. (See, e.g., Ross v. Pan Amer. Airways, 299 N. Y. 88; Block v. Compagnie Nationale Air France, 386 F. 2d 323, 332.) In the Ross case, our court held that “the Convention becomes the law of the carriage when the ‘ contract ’ of the parties provides for passage between certain described termini. When such is the contract, then the Convention has automatic full impact, by its own terms ” (299 N. Y., at p. 97).
The Convention’s emphasis on the contract actually “ made ” appears to have been specifically designed to prevent any subsequent intervening circumstances from affecting the result. The reason is manifest; as one commentator put it, “ [t]his prescription possesses, for the parties involved, the appreciable advantage of settling in advance the application of the Warsaw Convention, thus becoming independent of fortuitous events ”. *167 (Coquoz, Le Droit Prive Internationale Aerien, p. 95; see, e.g., Convention, art. 3, subd. [1], par. [c], infra, p. 168, n. 4.)
The contract embodied in the original ticket issued in this case was undoubtedly for international transportation since, in the words of the Convention (art. 1, subd. [2]), it provided for ‘ ‘ an agreed stopping place within a territory * * * of another power ”. Whether or not Mrs. Seiter might have been able to rescind this contract and enter into a wholly new one of an entirely domestic character in Seattle, the simple fact is that she chose not to do so.[3] The remainder of her journey—from Seattle to Chicago and from Chicago to New York—was performed under the original contract; and since, as already noted,, it provided for international transportation, it was subject to the Convention.
Plaintiffs contend, however, that, in view of the bus trip from Vancouver, the later flights were not performed by “ successive air carriers” as required by the Convention (art. 1, subd. [3]) and that, in order for a subsequent domestic flight to be subject to the Convention, the international transportation must be “completely by air ”. It may well be true — although we need not now consider the matter—that, had the parties initially agreed that the journey from Vancouver to Seattle would be by bus, the Convention would not have been applicable to the later flights. (See Drion, Limitation of Liabilities in International Air Law, p. 52.) But Northwest was unquestionably named as a successive air carrier on the ticket originally issued pursuant to that contract and, so long as the flight was performed under it, the Convention applies.
Nor can there be any doubt that the American .Airlines flight from Chicago to New York was also performed under the original contract. It is to be noted that it was not Mrs. Seiter but the contracting airline, Northwest, which obtained the ticket out of Chicago for her. Examination of that ticket discloses *168 that it was a part of a “ complete routing ” from New York to Vancouver, and back again to New York, at the fare originally paid. The respondent American may not be regarded as an outside party, a stranger to the contract for international carriage in view of the fact that the passenger had agreed in that contract that Northwest “ may without notice substitute alternate carriers or aircraft” (Conditions of Contract, Item No. [7]).
It is equally clear that American did not have to be an actual party to such original contract in order to obtain the benefits of the Convention: subdivision (1) of article 30 specifically provides that any successive air carrier who accepts passengers under a contract for international transportation is ‘ ‘ subjected] to the rules set out in this convention, and shall be deemed to be one of the contracting parties to the contract of transportation ”.
This brings us to the plaintiffs’ further argument that, even if the Warsaw Convention applies, the carrier is not entitled to invoke the provisions limiting its liability because the ticket-delivered to Mrs. Seiter did not give sufficient notice that the rules of the Convention relating to the limitation of liability were applicable.
Under article 3 (subd. [1], par. [e]) of the Convention, an airline is required to deliver a passenger ticket which contains a “ statement that the transportation is subject to the rules relating to liability established by this convention ”.[4] The ticket *169 before us did contain, in footnotes on the several coupons, such a statement {supra, p. 164) but, as is apparent from inspection, it is in such exceedingly small and fine print as almost to defy reading.[5] Thus, although there was literal compliance with the prescription of article 3, the question arises whether such compliance satisfies the Convention’s demands when viewed in the light of its over-all purposes. We do not believe that it does. In our judgment, a statement which cannot reasonably be deciphered fails of its purpose and function of affording notice and may not be accepted as the sort of statement contemplated or required by the Convention.
In support of its argument to the contrary, the respondent points to Ross v. Pan Amer. Airways (299 N. Y. 88, supra). The ticket there under consideration, not too unlike the one before us, had been delivered not to the passenger personally but to a third person who had been in charge of all arrangements up to the time of the plane’s departure. In holding that delivery to the latter was sufficient, the court observed that, when a ticket provided for international transportation, the Convention applied “by its own terms and not because the parties have so agreed ” and that the carrier need show no more than delivery of the ticket (p. 97). As already indicated, the sole question presented concerned the adequacy of such delivery. No argument was made by the passenger as to the form of the ticket or the readability of the statement as to liability. And, indeed, in 1964, 15 years later, the court decided Eck v. United Arab Airlines (15 N Y 2d 53) and, despite the carrier’s strong reliance on the rationale and language of Ross, expressly rejected a “ strictly literal reading ” of the Convention or any of its provisions. Remarking the changes which had occurred in the years since the Convention had been drafted and stressing the vital canon of construction that, when a treaty is invoked, *170 “ what is to be applied are its principles if its purposes are to be observed” (emphasis in original), the court declared (P- 59):
“ The reasoning which supports a strictly literal reading of the phrase might not have done violence to the over-all scheme and design of the Convention under the conditions existing when the treaty was drafted. At that time it would have been in harmony with the methods under which the carriers were operating and with the objectives of the Convention. [Case cited.] Now, however, almost a half century later, when the carriers have radically changed their methods of booking passage, the whole scheme of the treaty in relation to international air travel makes it imperative to analyze this self-executing treaty in assigning meaning to any part of it. In doing this it must be recognized that the literal wording of one particularly applicable section of the entire treaty should not set the limits of our interpretive examination.”
And, even more recently, the United States Court of Appeals for the Second Circuit, confronted with the precise problem now before us, decided that a ticket, containing a statement (as to the carrier’s liability) virtually identical in content and form with that in this case, failed to give passengers the notice required by the Convention. (See Lisi v. Alitalia-Linee Aeree Italiane, 370 F. 2d 508, supra, cert, granted 36 U. S. Law Week 3189.) After observing that “ [t]he Convention’s arbitrary limitations on liability—which have been severely and repeatedly criticized—are advantageous to the carrier?’, the court, in an opinion by Judge Kaufman, went on to say that “ the quid pro quo for this one-sided advantage is delivery to the passenger of a ticket * * * which give[s] him notice ” of a “ very substantially ” limited liability and affords him “ the opportunity to purchase additional flight insurance or to take such other steps for his self-protection as he sees fit ” (pp. 512-513). Pointing out'that the statement on the tickets under consideration was printed in such a manner as to be virtually unnoticeable and unreadable, the court concluded, as already noted, that the tickets did not give the passengers the required notice.
*171 Other interpretations of article 3 have also taken into account the fact that a traveler today is likely to undertake international travel quite casually and without realizing the drastically limited protection he is receiving when compared to that provided by domestic flights. (See Mertens v. Flying Tiger Line, 341 F. 2d 851 [2d Cir.]; Warren v. Flying Tiger Line, 352 F. 2d 494 [9th Cir.]; but see Seth v. British Overseas Airways Corp., 329 F. 2d 302, 307 [1st Cir.].) In the Mertens case (341 F. 2d 851, supra), the court read article 3 “ to require that the ticket be delivered to the passenger in such a manner as to afford him a reasonable opportunity to take measures to protect himself against the limitation of liability ” (p. 856) and held that the requirement was not met by reason of the fact, among others, that the ticket delivered was ‘ ‘ printed in such a manner as to virtually be both unnoticeable and unreadable ” (p. 857). In addition, the Civil Aeronautics Board in 1963 adopted a regulation requiring (1) that the statement as to limitation of liability follow the far more clear and specific language specified by the board; (2) that it “be printed in type at least as large as ten point modern type [as contrasted with the 4½ point type in this case] and in ink contrasting with the stock”; and (3) that a similar statement be placed at all ticket counters in letters at least one fourth of an inch high (Code of Fed. Reg., tit. 14, § 221.175).[6]
These decisions and regulations are suggestive of a national policy requiring that air carriers give passengers clear and conspicuous notice before they will be permitted to limit their liability for injuries caused by their negligence. An examination of the ticket forms which the respondent used, in the light of *172 that policy, can only lead one to conclude that Mrs. Setter was not sufficiently apprised of the consequences which would result from the fact that her flight happened to carry her outside of the United States. Despite the fact that the Convention was applicable to her journey, the carrier’s failure to give the requisite notice prevents it from asserting a limitation of liability. Accordingly, the plaintiffs’ motion to dismiss the third affirmative defense should have been granted.
The order of the Appellate Division should be reversed, with costs in all courts, and the certified question answered in the negative.
Judges Van Voorhis, Burke, Scileppi, Bergan, Keating and Breitel concur.
Order reversed, with costs in all courts, and case remitted to Supreme Court, Kings County, for further proceedings in accordance with the opinion herein. Question certified answered in the negative.

. The outside back cover of the ticket also contained a statement of “ Conditions of Contract,” likewise printed in miniscule type, reading in part as follows:
“ (2) (a) Carriage hereunder is subject to the rules and limitations relating to liability established by the Convention for the Unification of Certain Rules relating to International Carriage by Air, signed at Warsaw, October 12, 1929 (hereinafter called ‘the Convention’) Unless such carriage is not ‘international carriage ’ as defined by the Convention. (See carrier’s tariffs, conditions of carriage for such definition). Carrier’s name may be abbreviated in the ticket, the full name and its abbreviation being set forth in carrier’s tariffs, conditions of carriage, regulations or timetables; and carrier’s address shall be the airport of departure shown opposite the first abbreviation of carrier’s name in the ticket; and for the purpose of the Convention the agreed stopping places (which may be altered by carrier in case of necessity) are those places, except the place of departure and the place of destination, set forth in this ticket and any conjunction ticket issued herewith, or as shown in carrier’s timetables as scheduled stopping places on the passenger’s route.”

. Article 1 of the Convention, which bears on its applicability, reads as follows:
“(1) This convention shall apply to all international transportation of persons, baggage, or goods performed by aircraft for hire. It shall apply equally to gratuitous transportation by aircraft performed by an air transportation enterprise.
“ (2) For the purposes of this convention the expression ‘ international transportation’ shall mean any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the transportation or a transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty, mandate or authority of another power, even though that power is not a party to this convention. Transportation without such an agreed stopping place between territories subject to the sovereignty, suzerainty, mandate, or authority of the same High Contracting Party shall not be deemed to be international for the purposes of this convention.
“ (3) Transportation to be performed by several successive air carriers shall be deemed, for the purposes of this convention, to be one undivided transportation, if it has been regarded by the parties as a single operation, whether it has been agreed upon under the form of a single contract or of a series of contracts, and it shall not lose its international character merely because one contract or a series of contracts is to be performed entirely within a territory subject to the sovereignty, suzerainty, mandate, or authority of the same High Contracting Party.”

. That she took out a $50,000 insurance policy in Seattle has, as Special Term declared, " little bearing on [the passenger’s] intent relative to termination of the contract for international transportation or of the character of the trip from Seattle to New York in terms of internal or international passage.” Mrs. Seiter may have purchased the $50,000 policy because she desired coverage in addition to the $25,000 of insurance (to cover the round trip) which she had procured before leaving New York, in view of the forecast of bad weather. Its purchase certainly created no inference that she considered the round trip at an end.

. Article 3 provides:
“ (1) For the transportation of passengers the carrier must deliver a passenger ticket which shall contain the following particulars:
(a) The place and date of issue;
(b) The place of departure and of destination;
(e) The agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in ease of necessity, and that if he exercises that right, the alteration shall not have the effect of depriving the transportation of its international character;
(d) The name and address of the carrier or carriers;
(e) A statement that the transportation is subject to the rules relating to liability established by this convention.
(2) The absence, irregularity, or loss of the passenger ticket shall not affect the existence or the validity of the contract of transportation, which shall none the less be subject to the rules of this convention. Nevertheless, if the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of those provisions of this convention which exclude or limit his liability.”

. One court has described the notice in this way (Lisi v. Alitalia-Lmee Aeree Italiane, 253 F. Supp. 237, 243, affd. 370 F. 2d 508):
“The footnotes printed in microscopic type at the bottom of the * * * coupons', as well as condition 2(a) camouflaged in Lilliputian print in a thicket of ' Conditions of Contract’ crowded on [the outside back cover], are both unnoticeable and unreadable. Indeed, the exculpatory statements on which defendant relies are virtually invisible. They are ineffectively positioned, diminutively sized, and unemphasized by bold face type, contrasting color, or anything else. The simple truth is that they are so artfully camouflaged that their presence is concealed.”

. The language of the statement which was mandated by the CAB was similar to that provided for in the amendment to article 3 appearing in the so-called Hague Protocol to the Convention executed in 1955. (See 3 CCH Aviation L. Rep., par. 27,106.) This Protocol was never ratified by the Senate, apparently because its most significant feature, increasing the maximum liability to $16,000, was considered inadequate. It is of more than passing interest that in 1965 our Government in a Notice of Denunciation declared that it opposed the Convention’s low limits on liability and indicated an intention to withdraw from the Convention unless an agreement were reached (among the world’s international air carriers) to raise the limit to $75,000 and that in May of 1966 such an agreement was executed. (See 3 CCH Aviation L. Rep., par. 27,130; The Warsaw Convention — Recent Developments and the Withdrawal of the United States Denunciation, 32 J. Air L. & Com. 243.)