462 F.Supp. 1114 (1978)
In re AIR CRASH in BALI, INDONESIA.
John P. CAUSEY, Jr., Individually and as Executor of the Estate of John P. Causey, Sr. and as Administrator with Will Annexed of Estate of Virginia D. Midgett Causey, Plaintiffs,
v.
PAN AMERICAN WORLD AIRWAYS, INC., a New York Corp., Defendant.
Margaret G. JOHNS as Guardian as Litem of John Treloar Ryder, Sarah Jane Ryder and Simon Bruce Ryder, minors, Plaintiffs,
v.
PAN AMERICAN WORLD AIRWAYS, INC., a New York Corp., Defendant.
Simone RYDER, Individually and as heir of John Willson Ryder, Deceased, Plaintiff,
v.
PAN AMERICAN WORLD AIRWAYS, INC., Defendant.
M.D.L. No. 215. Nos. CV 75-1364-DWW, CV 76-1120-DWW and CV 75-3293-DWW.
United States District Court, C. D. California.
October 27, 1978.
*1115 *1116 A. George Glasco, Los Angeles, Cal., James G. Butler, Butler, Jefferson & Dan, Los Angeles, Cal., for plaintiffs on behalf of the heirs and next of kin of John Willson Ryder (deceased).
Mark D. Robinson, Horgan & Robinson, Los Angeles, Cal., for plaintiffs on behalf of the heirs and next of kin of John Paul Causey and Virginia D. Midgett Causey (deceased).
Daniel W. Winters, Philip L. Johnson, Tucker & Coddington, Los Angeles, Cal., for defendant Pan American World Airways, Inc.

MEMORANDUM
DAVID W. WILLIAMS, District Judge.
On April 22, 1974 a Boeing 707 aircraft operated by Pan American World Airways as Flight 812 was headed from Hong Kong to the island of Bali, Indonesia, intending to land at Den Passar Airport, located at the island's southern tip. In darkness it began its descent and landing approach, but became lost. Instead of retracing its path and climbing higher, the crew kept the craft at an inordinately low altitude for too long a period. The plane crashed into a mountain located 37 miles north of the airport, killing all 96 passengers and the 11 crew members.
Numerous lawsuits were filed in several federal districts of the United States, and the Multidistrict Litigation Panel ordered all the suits transferred to the Central District of California for pretrial supervision. At this writing, most of the suits have been settled.
Wrongful death actions on behalf of the survivors of three of the passengers, John and Virginia Causey and John W. Ryder, were tried to a jury. The trial was bifurcated so that claims of the applicability of the Warsaw Convention[1] and its progeny[2] and the defenses arising from a contract of carriage, all having the effect of a limitation of damages, would be deferred until after the jury's damage verdict. This court earlier decided that, under the choice of law rules that should prevail, this action was governed by the wrongful death law of California.[3] The jury determined the accident was caused by the negligence, but not the wilful misconduct, of the defendant and that the Causey kin should receive total damages of $300,000 and the Ryder plaintiffs the sum of $651,500. A finding of wilful misconduct, under Article 25 of the Warsaw Convention,[4] prevents an air carrier from availing itself of any other provisions *1117 of the Convention which exclude or limit liability. Because there was no such finding, an issue remained as to the applicability of any liability limitation found in the Warsaw Convention and its progeny.
Following the jury verdict, plaintiffs moved this court to exclude all evidence concerning the contest of the contract of carriage between the airline and the passengers, as well as evidence of the applicability of the Warsaw Convention on the grounds that such evidence was irrelevant and immaterial to the issues of these cases. Pan American opposed these motions. After a consideration of the moving and opposing papers and substantial oral argument, the court concludes:
1) The California wrongful death statute under which plaintiffs bring their case provides survivors with an independent cause of action arising upon the decedents' death and derived in no way from any cause of action belonging to the decedent.
2) Such cause of action is unaffected by any contract made by the decedents.
3) The Warsaw Convention, the Hague Protocol, and the Montreal Agreement provide air carriers with a basis contractually to limit liability. Air carriers may avail themselves of the limitation only if there is a contractual acceptance of the liability limitation, either actual or legal, by the party against whom the limitation is sought to be imposed.
4) The Warsaw Convention and its progeny do not limit an air carrier's liability with respect to the survivors' California wrongful death action.
5) Any evidence concerning the actual and legal delivery of a passenger ticket to the decedents, including physical delivery, timeliness of delivery, type size, and contents, is therefore irrelevant and immaterial to any issue before either the jury or the Court.
6) The plaintiffs' motions to exclude evidence on the Warsaw Convention and its progeny is granted.

I. THE CALIFORNIA WRONGFUL DEATH ACTION

It is a settled California rule that its wrongful death statute creates an original cause of action not derived from any rights the decedent may have had. Earley v. Pacific Electric Ry. Co., 176 Cal. 79 at 81, 167 P. 513 (1917); Burk v. Arcata & Mad River R.R. Co., 125 Cal. 364 at 367, 57 P. 1065 (1899); Munro v. Pacific Coast Dredging Co., 84 Cal. 515 at 524, 24 P. 303 (1890); Marks v. Reissinger, 35 Cal.App. 44 at 53, 169 P. 243 (1917). It vests in certain heirs upon the decedent's death. Earley, 176 Cal. at 81, 167 P. 513; Burk, 125 Cal. at 367, 57 P. 1065; Marks, 35 Cal.App. at 51, 169 P. 243. It has its own measure of damages. Earley, 176 Cal. at 81, 167 P. 513; Burk, 125 Cal. at 368, 57 P. 1065; Marks, 35 Cal.App. at 51, 169 P. 243; see Blackwell v. American Film Co., 189 Cal. 689 at 694, 209 P. 999 (1922). Because of the separate and original nature of this wrongful death action, a decedent, while he is alive, cannot contract away or compromise the wrongful death cause of action, nor effectively release from wrongful death liability a potential defendant. Earley, 176 Cal. at 79, 167 P. 513; Marks, 35 Cal.App. at 54, 169 P. 243. See Blackwell, 189 Cal. at 693, 209 P. 999. In Marks, the court squarely held that heirs seeking to recover in a wrongful death action cannot be defeated or affected by anything that the deceased could have said or done. In oral argument, defendant's counsel conceded the correctness of this interpretation of California law. Because, then, the cause is a new right of action independent of any right the decedent may have, and because it cannot be waived by the decedent or otherwise affected by decedent's contracting during life, any contract of carriage pursuant to which a decedent purports to limit the right to recover for his death therefore cannot affect this cause of action. If the issue before this court were simply a liability limitation in a contract of carriage entered into by a decedent, then it is clear that such limitation would have no effect in a California wrongful death action. The question remains whether in the instant case the Warsaw Convention, 49 Stat. 3000 (1934) dictates a different result.

*1118 II. THE WARSAW CONVENTION

A. History[5]
The Warsaw Convention was the result of two international conferences held in Paris in 1925 and Warsaw in 1929. The purpose of the conference was twofold. First, since aviation was obviously going to link many lands with different languages, customs and legal systems, it would be desirable to establish a certain degree of uniformity. The convention achieved this almost completely as to documentationtickets, waybills and the like. The second goal was to limit the potential liability of the carrier in case of accidents. The convention provided that carriers were liable for damages sustained by a passenger in the course of a flight or while embarking or disembarking, but limited this liability to 120,000 Poincairé francsapproximately 8300 U.S. dollars.[6] One of the bargains contained in the convention was that while retaining a limitation of liability, the convention shifted the burden of proof so that the carrier was presumed liable unless it could show that it had taken all necessary measures to avoid damages or that it was impossible for it to take such measures.[7]
The United States was not a party to the two international conferences in 1925 and 1929 which led to the Warsaw Convention, and only sent an observer. Five High Contracting parties deposited their ratifications to the original convention, and by the end of 1933 twelve countries were members. This did not include the United States. In November of 1933 the Commerce Department and the State Department realized the utility of the United States becoming a party to the convention and the Secretary of State recommended to President Roosevelt its approval of the treaty.
Article 38 of the Convention provides:
"(1) This convention shall, after it has come into force, remain open for adherence by any state.
(2) The adherence shall be effected by a notification addressed to the Government of the Republic of Poland, which shall inform the Government of each of the High Contracting Parties thereof.
(3) The adherence shall take effect as from the 90th day after the notification made to the Government of the Republic of Poland."
President Roosevelt submitted the Treaty to the Senate and on June 15, 1934, the Senate gave its advice and consent by voice vote.[8] The United States deposited its instrument of adherence on July 31, 1934 and the President proclaimed the Treaty 90 days later.[9] Thus, the United States had nothing to do with formulation of the convention and did not ratify it but adhered to it shortly after it went into effect, pursuant to Article 38.
A diplomatic conference was convened at the Hague in September, 1955 to consider, (a) the problem of raising the limits of liability over the prevailing $8300 ceiling, and (b) the clarification or modification of the convention's Article 25, under which there were no limits of liability if a plaintiff could successfully establish that the accident was caused by "wilful misconduct." It was proposed to raise the limits of liability to $13,300. The United States tried to get the limits raised to $25,000 and after a great deal of argument it was agreed to raise the limits of liability to $16,600, exactly double the Warsaw sum. In addition, Article 25's language was modified. The Hague Protocol prepared by the conference embodied these provisions.
For several years thereafter, little effort was made in the United States towards ratification of the Hague Protocol, which did not satisfy the opponents of the Warsaw Convention's liability provision. Increasing *1119 dissatisfaction in the United States and by the United States government with the Warsaw Convention's liability limitation had already led to modification proposals in the Hague Conference of 1955. As another attempt to modify the limitation, the Kennedy-Johnson Administration introduced domestic legislation, under which air carriers would be required to insure passengers at a higher level. Airline opposition to the compulsory insurance scheme led to the executive branch decision to denounce the Warsaw Convention on November 15, 1965, effective six months later, on May 15, 1966. On the same date that the formal notice of denunciation was deposited by the United States, the Department of State issued a press release which stated:
"The United States would be prepared to withdraw the notice of denunciation deposited today if prior to its effective date of May 15, 1966, there is a reasonable prospect of an international agreement on limits of liability in international air transportation in the area of $100,000 per passenger or on uniform rules but without any limit of liability, and if, pending the effectiveness of such international agreement, there is a provisional arrangement among the principal international airlines waiving the limits of liability up to $75,000 per passenger."[10]
Under the impetus of the United States' dissatisfaction and of its denunciation of the treaty, the International Civil Aviation Organization, of which the United States is a member, met in Montreal in February, 1966, to work out a new liability limitation. The Montreal Conference ended with inconclusive results. As the effective date of the United States' denunciation neared, air carriers both United States and foreign reconsidered interim measures they had found unacceptable earlier. The carriers agreed to accept a system under which they were subject to a liability limitation of $75,000, without regard to fault on the part of the carrier.[11] The United States government, as a result of this acceptance by the carriers, withdrew its denunciation of the Warsaw Convention. The Montreal Agreement is the term used for the liability system that emerged out of these events of 1965 and 1966. Dunn v. Trans World Airlines, Inc., 589 F.2d 408 at 410 (9th Cir. 1978).

B. The Limitation of Liability

Counsel argued the nature of the liability limitation in the Warsaw Convention and its progeny, the Hague Protocol, and the Montreal Agreement. Defendant's contention is that: 1) the Warsaw Convention is a treaty made under the authority of the United States and is therefore the supreme law of the land; and 2) the conventions expressly deal with the issue before this Court, and limit liability. Defendant cites in particular Article 22. Plaintiffs respond that the Warsaw Convention, by its terms, is applicable only to a contractual relationship which may exist between passengers and carriers; and that the Convention and its progeny read in their entirety merely provide a mechanism by which air carriers may limit their liability stemming from a contract of carriage, citing Article 1(2). Plaintiffs assert that the liability limitation is based upon contractual principles, citing Block v. Compagnie Nationale Air France, 229 F.Supp. 801, 811 (N.D.Ga.1964), and arguing their interpretation is consonant with the treaty's notice requirements.
The plaintiffs' argument on the general contractual nature of the liability limitation is persuasive, in light of the Warsaw Convention's text, case law, the Montreal Agreement and the circumstances surrounding it, and today's federal public policy towards air carriers.

1. Text:
In addition to Article 1(2), the provisions of Article 3 underline the contractual basis of the liability limitation. Article 3(1) requires that a ticket state that the *1120 transportation is subject to the convention's liability rule, while Section (2) provides that a carrier must deliver a passenger ticket to a passenger if it is to avail itself of the convention's liability limitations. Article 22's liability limitation, including its own reference to the parties' ability to contract specially, is ambiguous when read in the light of the above-mentioned articles. It is clear that there is some relationship between the liability limitation, the passenger ticket, and contract. It is unclear precisely what that relationship is. These articles should be construed, if practicable, so that they support and explain each other. Bernier v. Bernier, 147 U.S. 242, 13 S.Ct. 244, 37 L.Ed. 152 at 154 (1893). In order logically to reconcile these provisions, this court concludes that the liability limitation in Article 22 is one based upon contract between the parties to the contract of carriage. In order for the liability limitation to be effective, there must be a contractual acceptance, either actual or legal, of the limitation by the party against whom the limitation is sought to be imposed. Such an interpretation has the effect in this case of not limiting plaintiffs' recovery, given the nature of the California wrongful death cause of action.[12]

2. Case Law:
Plaintiffs' citation to Block v. Compagnie Nationale Air France, 229 F.Supp. 801, 811 *1121 (N.D.Ga.1964) is apposite. The case is authority for the proposition that the convention gives air carriers permission to contract for limited liability, and by implication requires that the limitation, at least indirectly, be contractually based.
Great support is shown for the contractual basis of the liability limitation, particularly in light of recent cases. In Glenn et al. v. Compania Cubana de Aviacion, S.A., et al., 102 F.Supp. 631 (S.D.Fla. 1952), Chief Judge Holland held that the Warsaw Convention was applicable in the wrongful death action before him, because the convention was designed to regulate "the rights and liabilities of parties to international carriage contracts by air . ." Id. at 633. It is now apparent that the threshold question of the convention's applicability depends upon the contract between the parties, and that the contract is expressed by the passenger ticket, e. g. Kelley v. Sabena Belgian World Airlines, 242 F.Supp. 129 (E.D.N.Y.1965); Burdell v. Canadian Pac. Airlines, Ltd., 11 Av.Cas. 17,251 (Ill.Cir.1969); Galli v. Re-Al Brazilian International Airlines, 29 Misc.2d 499, 211 N.Y. S.2d 208 (Sup.Ct. Queens Cty. 1961); Straton v. Trans Canada Air Lines, 7 Av.Cas. 17,724 (British Columbia, 1961); Egan v. Kollsman Instrument Corp., 44 Misc.2d 348, 253 N.Y.S.2d 679 (1964), aff'd on rehearing on newly discovered evidence, 47 Misc.2d 871, 263 N.Y.S.2d 398 (1965), aff'd 26 A.D.2d 633, 272 N.Y.S.2d 563 (App.Div. 1966), rev'd on other grounds 21 N.Y.2d 160, 287 N.Y.S.2d 14, 234 N.E.2d 199 (Ct.App.) (1967) (reversing on grounds that notice on ticket was inadequate). Today's courts treat the airline passenger ticket, absent effective notice of liability limitations, as a contract of adhesion. See Deutsche Lufthansa Aktiengesellschaft v. C. A. B., 156 U.S.App.D.C. 191, 479 F.2d 912 (1973); Lisi v. Alitalia-Linee Aeree Italiane, S.p.A., 253 F.Supp. 237 (S.D.N.Y.1966), aff'd 370 F.2d 508 (2d Cir. 1966), aff'd by an equally divided court, 390 U.S. 455, 88 S.Ct. 281, 19 L.Ed.2d 276 (1968); Mertens v. Flying Tiger Line, Inc., 341 F.2d 851 (2d Cir. 1965); and Warren v. Flying Tiger Line, Inc., 352 F.2d 494 (9th Cir. 1965).
Air carriers treat the tickets as contracts between them and the passengers.[13] It is interesting to note that the defendant in its pleadings and moving papers has asserted that the decedents were traveling under "a contractual ticket" or a "ticket contract,"[14] and in the pre-trial conference order, the defendant explicitly adopted as its position that the Warsaw Convention and its progeny were applicable through the conditions of contract in the tickets of the plaintiffs' decedents. In its contentions in the pre-trial conference, the defendants argued that the decedents ". . . boarded PAN AMERICAN Flight 812 pursuant to a ticket duly issued which contained a Notice to each passenger on the possible applicability of the Warsaw Convention, Hague Protocol, and/or Montreal Agreement."[15]
The pre-trial conference order framed the issues before this court, under Rule 9, Rules of the United States District Court for the Central District of California.
Ross v. Pan American Airways, Inc., 299 N.Y. 88, 85 N.E.2d 880 (1949), cert. denied sub. nom. Froman v. Pan American Airways, Inc., 349 U.S. 947, 75 S.Ct. 874, 99 L.Ed. 1273 (1955) is not contrary; in addition, its authority has been severely diminished by subsequent cases. In Ross, plaintiff *1122 in a personal injuries action argued that the Warsaw Convention's liability limitation did not apply because her ticket had been obtained for her by a third party, and therefore there was no "delivery" within the meaning of Article 3, which is necessary if the liability limitation is to apply. The majority of the court rejected this contention. Despite the fact that the plaintiff never had an opportunity to examine the ticket prior to her departure, the court found summary judgment appropriate for the defendant, on the grounds that plaintiff had implicitly or explicitly ratified the third party's ticketing for her. The dissent argued unsuccessfully that the language of the convention's Articles 1 and 3 required that plaintiff be given the opportunity to show that she had undertaken no contractual relationship with the air carrier. The logic of the dissenter's position is that the convention's liability limitation is based upon a contractual relationship between the injured party and the carrier, rather than an invocation of the phrases supremacy clause and international transportation. This logic is persuasive. In any event, this court is interpreting a document which is allegedly a federal treaty, and is not bound by state court interpretations. Noel v. Linea Aeropostal Venezolana, 247 F.2d 677, 679 (2d Cir. 1957).
In federal law, Grey v. American Airlines, 95 F.Supp. 756 (S.D.N.Y.1950) followed the Ross decision's liberal application of the Warsaw Convention. The Grey case was decided the year following the Ross ruling, in a federal district court sitting in the Ross court's state. Subsequent decisions, both federal and New York state, have both diminished the authority of the Ross and Grey cases and read them narrowly. In Lisi v. Alitalia-Linee Aeree Italiane, 253 F.Supp. 237 (S.D.N.Y.1966), the court limited Grey to stand for the proposition only that a ticket need not necessarily list all "agreed stopping places" as required by the treaty for the Warsaw Convention liability limitation to apply. Id. at n. 6. The Lisi court held that the liability limitation must be so included, if it is to have effect. Id. at 239. The court found a difference in the treatment accorded the two provisions appropriate, given the relative importance of the two. Id. at n. 6. The liability limitation was a major provision, the stopping places listing a minor one. See id. On appeal, the court affirmed both the lower court's decision and its reading of Grey, see 370 F.2d at 508, n. 8. In Mertens v. Flying Tiger Line, 341 F.2d 851 (2d Cir. 1965), the court reversed the trial court, which had found the liability limitation applicable. The Court of Appeals found the carrier's delivery of the ticket to the passenger was not adequate. This result was directly contrary to the result in Ross. The Mertens court construed the Ross case very narrowly, reading it to say only that "the limitation on liability does not depend `for its existence and validity on express assent thereto by the passenger.'" Id. at 857. The Mertens opinion was adopted by the Ninth Circuit in Warren v. Flying Tiger Line, 352 F.2d 494 (1965). The highest state court in New York has adopted a contract-like approach to the Warsaw Convention and has questioned the continued strength of the Ross decision, see Egan v. Kollsman Instrument Corp., 21 N.Y.2d 160, 287 N.Y.S.2d 14, especially 20, 234 N.E.2d 199 (Ct.App.1968). Grey has been limited to the allowable exclusion of minor terms only from the contract, while Ross stands only for the proposition that the express assent of the party to be bound by the limitation need not be given. In the case at bar, there is no assent to be bound by the plaintiffs, nor could the plaintiffs' decedents have contractually limited the plaintiffs' causes of action, given the clearly recognized nature of the California wrongful death cause of action.
The recent trend, particularly the ticket notice cases, including Warren v. Flying Tiger Line, demonstrates the courts' willingness to review the interpretation of Warsaw[16] and the courts' protection of injured *1123 parties from Warsaw's liability limitations, in part through contractual and contract-like principles. Since there is no privity between the air carrier and the plaintiffs this court holds that the Warsaw Convention's liability limitation does not apply in the present case.

3. The Montreal Agreement:
The Montreal Agreement and the events surrounding it establish that this court's interpretation of the liability limitation is the correct one. The Montreal Agreement as such is an agreement among the air carriers, drafted with the participation of the Department of State, the CAB and the private International Air Transport Association. In the Agreement,[17] the carriers agree that each will include certain provisions in its contracts of carriage, specifically, 1) a liability limitation of $75,000, or $58,000 where a jurisdiction makes a separate award of litigation costs, and, 2) a notice to passengers advising them of the liability limitation. This agreement was approved by the Civil Aeronautics Board in an order dated May 13, 1966.[18] Article 2 of the Agreement refers to the resulting conditions of carriage as a special contract, and the CAB order approving the Agreement confirms that it establishes a special contract, "in accordance with Article 22(1) of the Convention."[19] The order further notes that passengers governed by this "special contract" mandated by the Agreement are entitled to the notice provided in the Agreement. Pursuant to the Montreal Agreement and the CAB order, all international air travel which, in the words of the CAB opinion, "includes a point in the United States as a point of origin, point of destination, or agreed stopping place" is subject to a special contract. Under this special contract liability is limited.
By their terms the Montreal Agreement and the CAB order make the liability limitation contractual in nature. This has been recognized by a noted commentator and has been adopted by a federal court. One author has noted that the Montreal system ". . . impose(s) upon international aviation involving the United States a quasi-legal and largely experimental system of liability that is essentially contractual in nature." L. Kreindler, 1 Aviation Accident Law, Ch. 12, § 12A.02 at 3 (1975). In Husserl v. Swiss Air Transport Co., Ltd., 351 F.Supp. 702 at 704 n. 1 (S.D.N.Y.1972), the court quoted Kreindler on this point with approval, and by its observation elsewhere in its opinion demonstrated that it viewed Warsaw liability as contractually based, both before and after the Montreal Agreement. The court stated, "Yet it is difficult to question the modification effectuated by the Montreal Agreement of the contractual relationship between the parties within the Warsaw Convention system of liability." Id. at 707.
On two grounds, the Montreal Agreement, the CAB order and the circumstances surrounding their adoption establish that the air carriers' limitation of liability is contractually based. First, they are an authoritative rule for this court to follow as to the meaning of the original Warsaw Convention's limitation of liability. The United States, by its acceptance of the Montreal Agreement in lieu of denunciation of the Warsaw Convention, has clearly interpreted the limitation of liability as one based on contract. Were the liability limitation not contractual in nature, then the United States could not accept a scheme clearly contractual to modify the limitation. Second, they supercede the Warsaw Convention in their provision of a basis to limit liability. The United States executive branch explicitly conditioned the withdrawal *1124 of its denunciation of the Warsaw Convention on the new liability limitation scheme. See CAB Order Number E-23680, 31 Fed.Reg. 7302 (May 19, 1966); CAB Press Release 66-61, 382-6031 (May 13, 1966); Department of State Press Release No. 110 (May 13, 1966). The low liability regime of the earlier Convention was rendered moot. Id. This court must give substantial weight to the construction given by the executive branch to a treaty, although it must not abdicate its judicial responsibility. Kolovrat v. Oregon, 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218, 223 (1961). Under the circumstances, in which the United States denounced the Warsaw Convention, and then withdrew its denunciation in the light of the Montreal Agreement, this court may analogize the Warsaw Convention to a statute reenacted after a definite interpretation has been given to a particular provision by an authoritative voice. In such a case, the intervening interpretation is deemed to be the correct one. E. g., Cammarano v. U. S., 358 U.S. 498 at 510, 79 S.Ct. 524 at 531, 3 L.Ed.2d 462 at 470 (1958); Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110 at 115, 59 S.Ct. 423, 83 L.Ed. 536 at 540 (1939); Morrissey v. Commissioner of Internal Revenue, 103 F.2d 234 at 235 (9th Cir. 1939). In this case, the executive branch by its adoption of the Montreal Agreement and its withdrawal of the Warsaw Convention denunciation requires that this court read into the Warsaw Convention the interpretation given by the Montreal Agreement. This interpretation, it has been shown, gives a contractual basis to the liability limitation.
Moreover, the liability limitation established by the Montreal Agreement is given the force of law through a tariff approved by the CAB in its opinion of May 13, 1966. It is hornbook law that an ambiguity in a tariff prepared by the carrier is construed against the carrier. E. g. Chicago & N.W. Ry. Co. v. Hunt-Wesson Foods, Inc., 504 F.2d 905 at 908 (7th Cir. 1974), Penn Cent. Co. v. General Mills, Inc., 439 F.2d 1338 at 1341 (8th Cir. 1971). Construing the tariff embodied in the Montreal Agreement, this court holds that air carriers were given the right to limit their liability to $75,000, only if a special contract exists between a carrier and the injured party. The Warsaw Convention's liability limitation is no longer viable. The remaining utility of the Convention remains not in the area of the liability limitation, but as a general international expression of the need for uniform air laws, see Department of State Press Release No. 110, May 13, 1966. In the specific area of the liability limitation, the United States by its denunciation, approval of the Montreal Agreement, and withdrawal of its denunciation, has demonstrated that a right to a high damage recovery is more important to the United States than conformity on this point. The argument made by the court in Reed v. Wiser, 555 F.2d 1079 (2d Cir. 1977), that great weight should be given to the need to have a uniform body of worldwide liability rules, is therefore not apposite here, where the United States has explicitly made its continued adherence to the Warsaw Convention contingent upon a non-uniform higher recovery rule for United States passengers.
As has been demonstrated in parts 1 and 2 of this section of the opinion, the basis of the Warsaw Convention's liability limitation is contractual. It is clear that whatever argument to the contrary could be made before, the Montreal Agreement and its adoption conclusively confirm that the liability limitation is founded in contract. This court is compelled to give meaning to the conception established by the Montreal Agreement that the liability limitation is based upon a special contract. Since the plaintiffs were not parties to any special contract limiting liability, their recoveries cannot be so limited.

4. Federal Public Policy:
To the degree that the Warsaw Convention has effect in this court, it has so as a federal treaty. In deciding its interpretation, this court must consider what result is demanded by federal public policy. It is clear that the present public policy of the United States is to view air carriers as viable entities no longer dependent upon *1125 government protection through an "infant industries" argument.
One must take into perspective the time factor in a consideration of the wisdom of this country subscribing to the Warsaw Convention in 1934. The aircraft industry was in its infancy, relatively minor in importance in the total public transportation picture and technologically in its formative years. For example, in the five-year period commencing 1925, the total airlines operation encompassed only 400 million passenger miles with a fatality rate of 45 per 100 million passenger miles. This compares with the rate of 0.55 fatalities per 100 million passenger miles in 1965.[20] The need to protect the infant airline industry was a clear rationale behind the adherence by the United States to the Warsaw Convention. Dunn v. Trans World Airlines, Inc., 589 F.2d 408 at 410 (9th Cir. 1978); Kelley v. Societe Anonyme Belge D'Exploitation, etc., 242 F.Supp. 129 at 138 (1965). Secretary of State Cordell Hull wrote to the president in the letter transmitting the convention to the Senate that the principle of limitation of liability was designed "to be an aid in the development of international air transportation." Senate Comm. on Foreign Relations, Message from the President of the United States Transmitting a Convention for the Unification of Certain Rules, Sen. Exec. Doc. No. G, 73d Cong., 2d Sess. 3-4 (1934).
The limitation imposed by Warsaw made sense at the time because the developing airline needed to have some assurance that it would not be financially wiped out by catastrophic accident. A totally different picture is presented today. The industry has grown to hold a major position in the area of public transportation, even causing competitive injury to rail and ship carriers. Technical and safety development has been such that the public has given wide acceptance to air travel and the incidents of air crashes have been materially reduced in number. There is now a strong factual basis for the argument that a legal limitation on the amount a plaintiff may recover in the event of an air tragedy is unwarranted. E. g., 1 L. Kreindler, Aviation Accident Law, Ch. 11, § 11.01(2), (5) (1975). The pioneering conditions and the lack of technical advancement and passenger safeguards which faced the industry when Warsaw was adopted have been supplanted by a technologically and commercially mature industry.
In recent years, the federal public policy towards air carriers has conclusively shifted away from a protective, infant industry approach to a less regulated, market-determined system. As a result, the rationale behind an industry-protective limited-liability approach to airline accidents, one of the keystones of the Ross decision, is gone. Rather than having a favored-industry status, airlines are now expected to stand on their own feet in the competitive market. One aspect of this new independence is responsibility for damages caused by its negligence.
Official recognition that federal public policy towards airlines should shift from a protective infant industries approach to a competitive one began in 1975, see Senate Subcommittee on Administrative Practices and Procedures of the Judiciary Committee, 94th Cong., 1st Sess., Civil Aeronautics Board Practices and Procedures (report, 1975). With the Carter Administration, this market-oriented approach to the airlines has become law through a series of CAB orders. See Las Vegas-Dallas/Fort Worth Nonstop Service Investigation, CAB Orders 78-3-121 (March 24, 1978), 78-7-116 (July 21, 1978); Proposed Rule Re: Domestic Passenger-Fare Investigation, 43 Fed. Reg. 16503 (1978); Domestic Passenger-Fare Investigation, CAB Order 78-8-152 (August 25, 1978), 43 Fed.Reg. 39522 (1978); Oakland Service Investigation CAB Order 78-4-121 (April 19, 1978), 43 Fed.Reg. 24083 (1978), CAB Order 78-9-96 (September 21, 1978), 43 Fed.Reg. 43515 (1978). This competitive policy towards air carriers has been definitively adopted by the United States, through the Airline Deregulation Act of *1126 1978.[21] This act phases out the CAB's authority over the major economic aspects of the airline industry, fares, routes, and mergers. Air carriers will be treated just like any other non-regulated industry.
An across-the-board liability limitation, if it ever made sense, did so only for the technologically and commercially infant air carriers earlier in the century. Today, the vigorous airline industry has been told by the United States executive and legislative branches to stand on its own feet. The judicial branch must recognize this policy. Modern federal public policy leads to the same result found appropriate by this court on grounds of the Warsaw Convention's text, the case law, and the Montreal Agreement: an air carrier may avail itself of the liability limitation only if there is a contractual acceptance, either actual or legal, of the limitation by the party against whom the limitation is sought to be imposed.
The evidence sought to be introduced by the defendant concerned the delivery of passenger tickets, adequacy of notice, and timeliness of delivery to the decedents, and air carrier filings with the government. This offer at best would establish a valid contractual limitation of liability based on the Warsaw Convention and its progeny only as between the decedents and the air carrier. Given the independent nature of the California wrongful death right of action, such a contractual limitation, even if found, could not as a matter of law diminish the plaintiffs' recovery. The evidence sought to be introduced is therefore irrelevant and immaterial to the instant action.
The clerk of court is directed to cause entry of judgment pursuant to the jury's damage verdicts of September 7, 1978.
NOTES
[1] Warsaw Convention, October 12, 1929, 49 Stat. 3000 (1934), 137 L.N.T.S. 11 (1929).
[2] Hague Protocol, September 28, 1955, 478 U.N.T.S. 371; Montreal Agreement, CAB Order No. E-23680, Vol. 31, No. 97 Fed.Reg. 7302 (May 19, 1966), approving Agreement CAB 18,900.
[3] Cal.Code Civ.Pro. § 377.
[4] Article 25 provides:

(1) The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct.
(2) Similarly the carrier shall not be entitled to avail himself of the said provisions, if the damage is caused under the same circumstances by any agent of the carrier acting within the scope of his employment.
[5] See Lowenfeld and Mendelsohn, The United States and the Warsaw Convention, 80 Harv. L.R. 497 (1967).
[6] This dollar equivalent has prevailed since the 1933 devaluation of the dollar.
[7] Article 20. The Montreal Agreement imposes absolute liability up to $75,000.
[8] 78 Cong.Rec. 11,582 (1934).
[9] 49 Stat. 3000.
[10] 50 Dep't State Bull. 923 at 924 (1965).
[11] For further discussion of this system and the basis of its legal authority, see Section II(B)(3) infra.
[12] The court finds the following Articles of Warsaw, inter alia, relevant to the question of the nature of the convention's liability limitation: (italics by the court):

Article 1
(1) This convention shall apply to all international transportation of persons, baggage, or goods performed by aircraft for hire. It shall apply equally to gratuitous transportation by aircraft performed by an air transportation enterprise.
(2) For the purposes of this convention the expression "international transportation" shall mean any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in the transportation or a transshipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty, mandate or authority of another power, even though that power is not a party to this convention. Transportation without such an agreed stopping place between territories subject to the sovereignty, suzerainty, mandate, or authority of the same High Contracting Party shall not be deemed to be international for the purposes of this convention.
(3) Transportation to be performed by several successive air carriers shall be deemed, for the purposes of this convention, to be one undivided transportation, if it has been regarded by the parties as a single operation, whether it has been agreed upon under the form of a single contract or of a series of contracts, and it shall not lose its international character merely because one contract or a series of contracts is to be performed entirely within a territory subject to the sovereignty, suzerainty, mandate, or authority of the same High Contracting Party.
. . . . .
Article 3
(1) For the transportation of passengers the carrier must deliver a passenger ticket which shall contain the following particulars:
(a) The place and date of issue;
(b) The place of departure and of destination;
(c) The agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in case of necessity, and that if he exercises that right, the alteration shall not have the effect of depriving the transportation of its international character;
(d) The name and address of the carrier or carriers;
(e) A statement that the transportation is subject to the rules relating to liability established by this convention.
(2) The absence, irregularity, or loss of the passenger ticket shall not affect the existence or the validity of the contract of transportation, which shall none the less be subject to the rules of this convention. Nevertheless; if the carrier accepts a passenger without a passenger ticket having been delivered he shall not be entitled to avail himself of those provisions of this convention which exclude or limit his liability.
. . . . .
Article 22
(1) In the transportation of passengers the liability of the carrier for each passenger shall be limited to the sum of 125,000 francs. Where, in accordance with the law of the court to which the case is submitted, damages may be awarded in the form of periodical payments, the equivalent capital value of the said payments shall not exceed 125,000 francs. Nevertheless, by special contract, the carrier and the passenger may agree to a higher limit of liability.
[13] See, e. g., the passenger ticket attached as exhibit A to defendant's motion for partial summary judgment on September 5, 1978. The ticket, typical of airline carriage documents, lists "Conditions of Contract", and the first such paragraph states "As used in this contract . . .."
[14] See, e. g., Answer of Defendant to First Amended Complaint, Simone Ryder v. Pan American World Airways, CV 75-3293, at ¶ 7 ("contractual ticket"); Opposition of Pan American World Airways, et al., to the Plaintiffs' Discovery Committee's Motion to Strike the Affirmative Defenses of the Warsaw Convention, etc., In Re Aircrash at Bali, MDL No. 215 (All Cases), at p. 14, where the liability limitation was discussed under the heading "contractual limitation," and the limitation argued pursuant to "the ticket contract."
[15] Pre-Trial Conference Order, pp. 28-29, at ¶¶ a, b, and c.
[16] See, e. g., Benjamins v. British European Airways, 572 F.2d 913 (2d Cir. 1978), in which Judge Lumbard reversed his own long standing opinions that the Warsaw Convention does not create a wrongful death action.
[17] Generally known as Agreement CAB 18,900.
[18] Order No. E-23680, Vol. 31, No. 97, Fed.Reg. 7302 (May 19, 1966).
[19] Note that under Article 22(1) special contracts are between "the carrier and the passenger."
[20] See 1965 annual report of the International Civil Aviation Organization Assembly.
[21] Signed by President Carter on October 24, 1978. As of the date of this writing, a public law number has not yet been assigned.