684 F.2d 1301
 11 Fed. R. Evid. Serv. 875
 In re AIRCRASH IN BALI, INDONESIA ON APRIL 22, 1974
John P. CAUSEY, Jr., etc., et al., Plaintiffs-Designated Appellants,
v.
PAN AMERICAN WORLD AIRWAYS, INC., etc.,
Defendants-Designated Appellees.
Simone RYDER, etc., et al., Plaintiffs-Designated Appellants,
v.
PAN AMERICAN WORLD AIRWAYS, INC., etc.,
Defendants-Designated Appellees.
Margaret G. JOHNS, etc., et al., Plaintiffs-Designated Appellants,
v.
PAN AMERICAN WORLD AIRWAYS, INC., etc.,
Defendants-Designated Appellees.
 Nos. 79-3341, 78-3761-78-3763.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 6, 1980.
Decided Aug. 24, 1982.
 
 Clinton H. Coddington, Tucker & Coddington, Los Angeles, Cal., Mark H. Gallant, Washington, D. C., for Pan American World Airways.
 James G. Butler, Los Angeles, Cal., for Ryder.
 Mark P. Robinson, Los Angeles, Cal., for Causey.
 Nicholas R. Allis, Geneva, Switzerland, for amicus.
 Appeal from the United States District Court for the Central District of California.
 Withdrawn and resubmitted-January 29, 1982.
 Before FLETCHER and PREGERSON, Circuit Judges, and SOLOMON,* District Judge.
 FLETCHER, Circuit Judge:
 
 
 1
 These suits arise out of an aircrash in Bali, Indonesia, on April 22, 1974, in which plaintiffs' decedents and 104 other persons were killed. A jury found defendant Pan American World Airways, Inc. (Pan Am) negligent, and awarded damages in the amount of $300,000 to the Causey plaintiffs and $651,500 to the Ryder plaintiffs. The district court declined to reduce the verdicts to the limits imposed by the Warsaw Convention, October 12, 1929, 49 Stat. 3000 (1934), 137 L.N.T.S. (1929) (arts. 17 & 22).
 
 
 2
 Defendant-designated appellee Pan Am appeals from the trial court's ruling that the Warsaw Convention is not applicable, and plaintiffs-designated appellants cross-appeal to attack evidentiary rulings made by the court in the course of trial.
 
 
 3
 * BACKGROUND
 
 A. The Warsaw Convention
 
 4
 The Warsaw Convention is a multilateral treaty. The Convention was drafted in 1929 and adhered to by most countries whose airlines have international routes. The United States adhered to the treaty in 1934. 49 Stat. 3000 (1934). The Convention standardizes, among the contracting countries, the documentation required for passengers and cargo on international[1] flights, id. at arts. 3, 4, 5-16, and makes uniform various procedural rules relating to claims for loss and damage, id. at arts. 26-31. It also limits the liability of air carriers in the event of accident or loss, id. at art. 22.
 
 
 5
 The Convention creates an express presumption that any accident is the result of carrier negligence unless the carrier can prove that all necessary measures were taken to avoid damages, or that it was impossible to take such measures. Id. at arts. 17, 20. The Convention excepts from the limit on the carrier's liability, injury or death caused by the carrier's "willful misconduct." Id. at art. 25. The Convention permits the passenger and the carrier to contract for a higher limit on liability, id. at art. 22, but invalidates any contract that purports to lower or remove the carrier's liability, id. at art. 23. Other provisions require the application of forum law to certain questions of procedure, id. at art. 28(2), contributory negligence, id. at art. 21, and to the determination of who has the right to bring suit and what their respective rights are, id. at art. 24(2). Article 28 regulates venue, and article 29 sets the statute of limitations for actions brought under the Convention. Other technical provisions are not relevant here.
 
 
 6
 Because of dissatisfaction with certain provisions of the Warsaw Convention, particularly the low limit set for personal injury or death,[2] an international conference convened at The Hague in September, 1955, for the purpose of amending the Convention. The agreement eventually raised the limit on carrier liability for injury from $8,300 to roughly $16,600, and amended the language of Article 25 relating to "willful misconduct." Hague Protocol, September 28, 1955, 478 U.N.T.S. 371; see Lowenfeld and Mendelsohn, The United States and the Warsaw Convention, 80 Harv.L.Rev. 497, 504-09 (1967) (hereinafter cited as Lowenfeld and Mendelsohn). The United States has not adhered to the Hague Protocol, at least in part because the limit on liability is still too low to satisfy critics of the Warsaw Convention. Lowenfeld and Mendelsohn, 80 Harv.L.Rev. at 509-16, 532-46; see Senate Comm. on Foreign Relations, Hague Protocol to Warsaw Convention, S. Exec. Rep. No. 3, 89th Cong., 1st Sess., and appendix (1965). Instead, in November, 1965, the United States denounced the Warsaw Convention, effective May, 1966 (the Convention requires six months' notice of withdrawal). 50 Dep't State Bull. 923 (1963). In an accompanying press release, the United States offered to withdraw its denunciation before it became effective if, prior to May, 1966, an international agreement could be reached that would substantially raise the limits on liability. Id. at 924.
 
 
 7
 In response, in 1966, international air carriers reached a private agreement, with the participation of the Department of State, the Civil Aeronautics Board, and the International Air Transport Association. Montreal Agreement, CAB Order No. E-23680, 31 Fed.Reg. 7302 (1966). The Montreal Agreement provides that the signatory airlines accept absolute liability for injury to passengers, up to a limit of $75,000 per passenger. The Agreement has the status of a special contract under article 22 of the Warsaw Convention. It applies to international transportation as defined in the Warsaw Convention, on airlines signatory to the agreement, provided that the intended journey includes a point of departure or agreed stopping place in the United States. Montreal Agreement § 1, 31 Fed.Reg. 7302.B. Proceedings Below
 
 
 8
 The plaintiffs in the case at bar challenged the application, validity, and constitutionality of the Warsaw Convention, the Hague Protocol and the Montreal Agreement. They also attempted to avoid the liability limitations by showing "willful misconduct" on the part of Pan Am. The jury found no willful misconduct. The Causey plaintiffs, who would have been entitled to the benefit of the Montreal Agreement's provision of strict liability up to a maximum of $75,000, chose instead to attack the Agreement and go to trial on negligence theories.
 
 
 9
 After the jury returned its verdict, the trial court ruled that under California law a decedent cannot by contract compromise his survivor's right to wrongful death recovery. Hence the contractual limitations imposed by the Warsaw Convention and subsequent agreements could have no operation. In re Air Crash in Bali, Indonesia, 462 F.Supp. 1114, 1126 (C.D.Cal.1978). The court thus never reached plaintiffs' challenge to the constitutionality of the Convention.
 
 II
 ANALYSIS
 A. The District Court's Decision
 
 10
 The district court, in refusing to apply the limitations on liability imposed by the Warsaw Convention, relied on California law. It reasoned that the Warsaw limitation is based on a contract between the passenger and the carrier, because (1) the Convention requires delivery of the ticket and written notice to the passenger of the limitation on liability before the limitation can be invoked, 462 F.Supp. at 1119-20; see Warren v. Flying Tiger Line, 352 F.2d 494 (9th Cir. 1965); (2) the passenger and the carrier may, by contract, agree to a higher limit on liability, 462 F.Supp. at 1120; and (3) the applicability of the Convention depends on the place of departure and the destination stated in the contract of carriage between the parties, id. at 1119. California does not permit a decedent to compromise by contract his survivors' right to wrongful death recovery. Id. at 1117; see Robison v. Leigh, 153 Cal.App.2d 730, 315 P.2d 42 (1957); Earley v. Pacific Electric Ry. Co., 176 Cal. 79, 167 P. 513 (1917). Any limitation based on contract with the decedent, therefore, can have no application against survivors under California law. The court then examined the federal public policy behind the Warsaw Convention. Finding that federal policy does not require broad application of the Convention's limitations, 462 F.Supp. at 1124-26 (citing 1 L. Kreindler, Aviation Accident Law, § 11.01(2), (5) (1975)), the court entered judgment on the jury's verdict for plaintiffs.[3]
 
 B. Application of California Law
 1. Choice of Law
 
 11
 The district court's decision presents two threshold questions: (1) Was the proper choice of law made? (2) Does the Warsaw Convention preempt local law in respect to limitation of liability for wrongful death? The Warsaw Convention requires recourse to local law to determine certain issues. See page 3, supra. This is not disputed, but Pan Am challenges the court's choice of California law. The jurisdiction of the federal district court in California is not challenged. It is proper both for purposes of diversity jurisdiction and under the jurisdictional provisions of the Warsaw Convention. Pan Am contends, however, that either Virginia law or the law of New South Wales, Australia, should be applied. The Causey decedents were residents of Virginia, the Ryder decedent a resident of New South Wales. Either of these states' laws, apparently, would impose a low dollar limit on wrongful death recovery even in the absence of the Warsaw Convention.
 
 
 12
 Pan Am first argues that Virginia law should govern the Causey case because the Causeys first filed in Virginia and then transferred the action to California. See Van Dusen v. Barrack, 376 U.S. 612, 639, 84 S.Ct. 805, 820, 11 L.Ed.2d 945 (1964). We find this argument unpersuasive since the Causey plaintiffs filed a second action in California, and it is on that action that the Causeys chose to go to trial. The transferred case was dismissed.
 
 
 13
 Since both the Causey and Ryder cases were filed in California, California's choice of law rules must be applied. Klaxon v. Stentor Electric Co., Inc., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Plaintiffs and Pan Am appear to agree on the substance of California's choice of law rule, but disagree on its application to the facts of this case. As both parties agree, California has adopted the "governmental interest" approach to questions of conflicts of laws. Hurtado v. Superior Court, 11 Cal.3d 574, 522 P.2d 666, 114 Cal.Rptr. 106 (1974). Under Hurtado, California will decline to apply its own law to a case brought in California only if it is shown that another state has a greater interest in having its law applied. Id. at 581, 522 P.2d at 670, 114 Cal.Rptr. at 110. The instant case presents a classic example of a "false conflict," i.e., a case in which more than one law could be applied, but in which only one state has any real interest in seeing its law applied. Id. at 581 & n.3, 522 P.2d at 670 & n.3, 114 Cal.Rptr. at 110 & n.3. As California has recognized, a limitation on wrongful death recoveries is intended to protect defendants from large verdicts. Id. at 583-84, 522 P.2d at 671, 114 Cal.Rptr. at 111. It is not an attempt to limit the compensation of plaintiffs. Pan Am has its principal place of business in California; plaintiffs reside in Virginia and Australia. Neither Virginia nor Australia has an interest in protecting a California defendant from wrongful death awards and California has chosen not to protect its resident defendants.[4] We conclude therefore that the trial court was correct in applying California law.
 
 2. Preemption
 
 14
 The district court apparently did not consider whether the Warsaw Convention preempts the application of California's rule regarding the limitation by contract of wrongful death recoveries.
 
 
 15
 Although the district court may have concluded that the Warsaw Convention did not expressly preempt California law, it did not consider whether the application of California law would conflict with the Congressional scheme embodied in the Convention. See Ray v. Atlantic Richfield Co., 435 U.S. 151, 157-58, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978); City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 633, 93 S.Ct. 1854, 1859, 36 L.Ed.2d 547 (1973). This is clearly not a case in which Congress intended to preempt all state legislation in the field, since the Convention specifically requires the application of local law to some issues. See page 3, supra. However, federal law may also preempt the application of state law where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).
 
 
 16
 Congress ratified[5] the Warsaw Convention in 1934. The Convention's application is to international air transportation. Its purposes are two-fold: providing uniformity in respect to documentation and certain procedural matters, and imposing limitations on liability. When the Convention was transmitted to the Senate for ratification, it was accompanied by a letter from then-Secretary of State Cordell Hull, which stated in part:
 
 
 17
 It is believed that the principle of limitation of liability will not only be beneficial to passengers and shippers as affording a more definite basis of recovery and as tending to lessen litigation, but that it will prove to be an aid in the development of international air transport, as such limitation will afford the air carrier a more definite and equitable basis on which to obtain insurance rates, with the probable result that there will eventually be a reduction of operating expenses for the carrier and advantages to the travelers and shippers in the way of reduced transportation charges.
 
 
 18
 S.Doc.Exec.G., 73d Cong., 2d Sess. 3-4 (1934). Although there were no hearings and no debate in the Senate at the time the Convention was ratified, Secretary Hull's letter and subsequent history make it clear that the limitation on liability was an important feature of the Convention. See, e.g., Hearings on the Hague Protocol to the Warsaw Convention Before the Senate Committee on Foreign Relations, 89th Cong., 1st Sess. 49-54 (1965); S.Rep. 2032, 88th Cong., 1st Sess. (1963); H.R. 8386, 88th Cong., 1st Sess. (1963); Senate Comm. on Foreign Relations, Hague Protocol to Warsaw Convention, S. Exec. Rept. No. 3, 89th Cong., 1st Sess. (1965). See generally, Lowenfeld and Mendelsohn, 80 Harv.L.Rev. at 509-16, 532-46.
 
 
 19
 Whatever its benefits were in 1934, the district court noted that the low limitation on liability cannot be justified today by the conditions that existed in 1934, 462 F.Supp. at 1124-26. The court observed that the airline industry is no longer in its infancy: "(t)he pioneering conditions and the lack of technical advancement and passenger safeguards which faced the industry when Warsaw was adopted have been supplanted by a technologically and commercially mature industry." Id. at 1125. Unfortunately, we know of no doctrine that would allow us to examine congressional enactments to see if they still serve the purpose for which they were designed. If the Warsaw Convention was intended to preempt state law in the area of liability for wrongful death on international flights, we may not avoid preemption by substituting our judgment for that of Congress to hold that the Convention has outlived its usefulness. Furthermore, Congress has had ample opportunity to reconsider the wisdom of the Convention, but it has yet to effect any changes. See, e.g. Hearings on the Hague Protocol to the Warsaw Convention Before the Senate Committee in Foreign Relations, 89th Cong., 1st Sess. (1965).
 
 
 20
 The application of California law suggested here necessarily conflicts with the congressional scheme. Neither uniformity nor an effective limitation of the airlines' liability could be achieved if state law doctrines could be invoked to circumvent the application of the limitation. Accordingly, we hold that California law is preempted by the Warsaw Convention to the extent that California law would prevent the application of the Convention's limitation on liability. See Bradfield v. TWA, 88 Cal.App.3d 681, 687, 152 Cal.Rptr. 172, 175 (1979).
 
 III
 CONSTITUTIONALITY OF THE WARSAW CONVENTION
 
 21
 Plaintiffs contend that if California law is preempted by the Warsaw Convention, the limitation on liability is unconstitutional.[6]
 
 
 22
 Although courts are not often called upon to review the constitutionality of treaty provisions, there is no doubt that the power to make treaties is circumscribed by substantive provisions of the Constitution, and that the courts are competent to pass on the constitutionality of treaties. Reid v. Covert, 354 U.S. 1, 16-19, 77 S.Ct. 1222, 1230-1231, 1 L.Ed.2d 1148 (1965); see Geofroy v. Riggs, 133 U.S. 258, 267, 10 S.Ct. 295, 297, 33 L.Ed. 642 (1898). See generally, W. Cowles, Treaties and Constitutional Law: Property Interferences and Due Process of Law (1941); L. Henkin, Foreign Affairs and the Constitution 205-24 (1972). Treaties, under the Constitution, are the supreme law of the land. U.S.Const. Art. IV. As such, treaty provisions which create domestic law have the same effect as legislation, and supersede previous conflicting legislation. By the same token, such provisions are subject to the same substantive limitations as any other legislation. Reid v. Covert, 354 U.S. at 16-18, 77 S.Ct. at 1230-1231. Were this not so, a constitutional limitation on governmental power could be circumvented by means of a treaty, although the same objective could not be accomplished through legislation. Id.
 
 
 23
 Of course, statutes are entitled to a presumption of constitutionality, Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 83, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595 (1978); Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976), and treaties are entitled to the same deference. Furthermore, a court, in the process of reviewing treaty provisions, must studiously avoid imposing its own view of foreign policy objectives and must accept the foreign policy formulations of the executive and legislative branches. See Narenji v. Civiletti, 617 F.2d 745, 748 (D.C.Cir.1979). Nonetheless, there are ends which may not be accomplished either by statute or by treaty, however compelling the foreign policy interests may be. We conclude that the treaty at issue here must withstand essentially the same tests as would domestic legislation against a claim that it denies rights guaranteed by the Constitution.
 
 A. Plaintiffs' Constitutional Arguments
 
 24
 Plaintiffs make three constitutional challenges to the limitation: 1) that it is so arbitrary and unreasonable as to deprive them of substantive due process; 2) that it deprives them of equal protection of the laws; and 3) that it impermissibly burdens their constitutional right to travel.
 
 
 25
 The first two arguments are very similar to those made by the plaintiffs in Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). That case dealt with the constitutionality of the Price-Anderson Act, 42 U.S.C. § 2210 (1976), which sets a limit on the maximum liability for injury resulting from nuclear power plant accidents.
 
 
 26
 The plaintiffs in Duke Power claimed that the amount of the limitation was arbitrary and unreasonable, depriving them of due process and equal protection. The Court first held that the Price-Anderson Act, as an economic regulation under the Commerce Clause, would not violate due process unless arbitrary or irrational. Id. at 83, 98 S.Ct. at 2635. After reviewing the need for limitation of liability, and examining the procedural provisions of the Act, the Court concluded that it was not unconstitutional. Id. at 86-87, 98 S.Ct. at 2637. We conclude that article 22 of the Warsaw Convention, like the Price-Anderson Act, is an economic regulation which would be constitutional under the Commerce Clause unless arbitrary or unreasonable.
 
 
 27
 Plaintiffs' third argument is that the severe limitation on recovery for wrongful death impermissibly burdens their decedents' right to travel. International travel, like interstate travel, is a fundamental right. Zemel v. Rusk, 381 U.S. 1, 13-14, 85 S.Ct. 1271, 1279, 14 L.Ed.2d 179 (1965); Aptheker v. Secretary of State, 378 U.S. 500, 505-06, 84 S.Ct. 1659, 1663-64, 12 L.Ed.2d 992 (1964); Kent v. Dulles, 357 U.S. 116, 126, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958). Restrictions on international travel, therefore, must be carefully tailored to serve a substantial and legitimate government interest. Aptheker, 378 U.S. at 507-08, 84 S.Ct. at 1664-65. The imposition of a penalty on the exercise of the right to travel is the constitutional equivalent of a direct restriction. See Shapiro v. Thompson, 394 U.S. 618, 641-42, 89 S.Ct. 1322, 1335, 22 L.Ed.2d 600 (1969). Although a right-to-travel challenge to the Warsaw Convention involves the assertion by survivors of their decedents' right to travel, this may be one of the cases in which constitutional rights can be successfully protected only if interested third parties are permitted to raise them. See Griswold v. Connecticut, 381 U.S. 479, 481, 85 S.Ct. 1678, 1679, 14 L.Ed.2d 510 (1965). Surely penalties that would be unconstitutional if imposed on the traveller himself cannot be validly imposed on his survivors, simply because they were not the ones who sought to exercise the right.
 
 
 28
 In support of their constitutional arguments, plaintiffs allege the following facts. Plaintiffs assert that, whatever the need for limitation of airline liability might have been in 1934, the need no longer exists and therefore cannot support the treaty provisions before us. The airline industry is no longer in its infancy. The fatality rate has dropped from 45 per 100 million passenger miles in 1925, to .55 per 100 million passenger miles in 1965. ICAO, Annual Report (1965). The statistical materials assembled for the proceedings leading up to the Montreal Agreement suggest that the increased cost of insurance if the Warsaw limitation were removed would be insignificant. See ICAO, 2 Special ICAO Meeting on Limits for Passengers Under the Warsaw Convention and the Hague Protocol 72-173 (1966); Lowenfeld and Mendelsohn, 80 Harv.L.Rev. at 566-67. Furthermore, it appears that the cost to airlines of additional insurance would be less than the cost to individual passengers of purchasing trip insurance. See 1 L. Kreindler, Aviation Accident Law § 11.01(5) (1975); Lowenfeld and Mendelsohn, 80 Harv.L.Rev. at 560-61. There is no allegation that domestic airlines, which are not protected by the Warsaw Convention limitations or comparable legislation, have been unable to procure insurance. Similarly, no one contends that the additional insurance, if required, would not be available. Compare Duke Power, 438 U.S. at 64, 98 S.Ct. at 2625 (potential liability beyond ability of private insurance companies to absorb).
 
 
 29
 The United States responds that in negotiations over the conditions of international air travel, concessions, particularly as to the limitation of liability, are necessary to gain the cooperation of foreign countries. The United States does not assert any national interest in limiting liability per se. In fact, continuing efforts are being made by the United States to raise or dispense with the limitations altogether. See, Lowenfeld and Mendelsohn, 80 Harv.L.Rev. 497 passim ; 1 L. Kreindler, Aviation Accident Law § 12B.01 (1980).
 
 
 30
 Plaintiffs also argue that the supposed benefits of the Warsaw Convention to some plaintiffs, e.g., the presumption of liability and the venue provisions, are illusory and do not constitute a quid pro quo for the liability limitation. Compare Duke Power, 438 U.S. at 87-90, 98 S.Ct. at 2637-2639. It has been persuasively argued that, for U. S. plaintiffs at least, the Convention confers no procedural benefits in personal injury suits. See, e.g., Lowenfeld and Mendelsohn, 80 Harv.L.Rev. at 516-32; 1 L. Kreindler, Aviation Accident Law § 11.01(5) (1980). The United States takes issue with this view, and argues that the benefits to plaintiffs may in some cases be significant.
 
 
 31
 We conclude that plaintiffs' due process and right-to-travel arguments, while substantial, would fail if another remedy were available that would provide them with full compensation. We find that such a remedy is available under the Tucker Act, 28 U.S.C. § 1491, if the liability limitation constitutes a "taking" under the fifth amendment.
 
 B. The Just Compensation Clause
 
 32
 No party to this litigation has argued that the Warsaw Convention limitation constitutes a "taking" that entitles plaintiffs to compensation by the United States under the just compensation clause of the fifth amendment. We raised this issue sua sponte and requested supplemental briefs from the parties for the reason that, if compensation is available under the Tucker Act, 28 U.S.C. § 1491, we do not reach the question of whether the Warsaw Convention is unconstitutional.
 
 
 33
 We do not by this resolution imply that substantive due process and just compensation are completely complementary protections.[7] There are some government regulations for which no adequate compensation could be paid, because they deprive persons of some aspect of life or liberty. In these cases, the regulation may be a violation of substantive due process. See, e.g., Moore v. City of East Cleveland, 431 U.S. 494, 500-06, 97 S.Ct. 1932, 1936-39, 52 L.Ed.2d 531 (1977); Roe v. Wade, 410 U.S. 113, 164, 93 S.Ct. 705, 732, 35 L.Ed.2d 147 (1973). There are cases, however, in which both a deprivation of substantive due process and a taking without just compensation are claimed. See Penn Central Transportation Co. v. New York City, 438 U.S. 104, 119, 98 S.Ct. 2646, 2656, 57 L.Ed.2d 631 (1978); Duke Power, 438 U.S. at 82, 94 n.39, 98 S.Ct. at 2635, 2641 n.39. Generally, if the loss claimed is compensable, the regulation will not be found unconstitutional. See Duke Power, 438 U.S. at 94 n.39, 98 S.Ct. at 2641 n.39. In Dames & Moore v. Regan, 453 U.S. 654, 689-90, 101 S.Ct. 2972, 2992, 69 L.Ed.2d 918 (1981), the Supreme Court held that if the executive agreement entered into with Iran to secure the release of American hostages ever effected a taking of the claimants' property, the Tucker Act remedy would be available. Justice Powell, concurring and dissenting, noted that, "(t)he Government must pay just compensation when it furthers the nation's foreign policy goals by using as 'bargaining chips' claims lawfully held by relatively few persons and subject to the jurisdiction of our courts." Id., 101 S.Ct. at 2993. See generally, L. Henkin, Foreign Affairs and the Constitution 259-66 (1972).
 
 
 34
 We first note that the "treaty exception" to the jurisdiction of the Court of Claims under the Tucker Act, 28 U.S.C. § 1502 (1976), is not a bar to suit by these plaintiffs in the Court of Claims. See Dames & Moore, 453 U.S. at 689-90, 101 S.Ct. at 2992. The exception is applicable only where the right asserted is created by or depends for its existence upon some treaty provision. That limitation has been narrowly construed. See Hughes Aircraft Co. v. United States, 534 F.2d 889, 902-06 (Ct.Cl.1976). The right asserted by plaintiffs here arises under California law, not treaty.[8] The Court of Claims would therefore have jurisdiction over any claim of a "taking" of that right.
 
 
 35
 We next look to whether plaintiffs' wrongful death claims are "property" within the meaning of the just compensation clause of the fifth amendment. Plaintiffs have a right under California law to recover damages caused by the wrongful death of their decedents.[9] There is no question that claims for compensation are property interests that cannot be taken for public use without compensation. Ware v. Hylton, 3 U.S. (3 Dall.) 199, 245, 1 L.Ed. 568 (1796); Gray v. United States, 21 Ct.Cl. 340, 392-93 (1886). See also, Regional Rail Reorganization Act Cases, 419 U.S. 102, 124-25, 95 S.Ct. 335, 349, 42 L.Ed.2d 320 (1974); Cities Service Co. v. McGrath, 342 U.S. 330, 335-36, 72 S.Ct. 334, 337, 96 L.Ed. 359 (1952).[10] We can see no reason why these plaintiffs' claims are any different, for fifth amendment purposes, from the claims of various creditors against the government of Iran, see Dames & Moore, 453 U.S. at 689, 101 S.Ct. at 2992.
 
 
 36
 Of course, whether or not a particular limitation amounts to a taking is a difficult question. "Takings" cases frequently turn on questions of degree. See, e.g., Penn Central Transportation Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); United States v. Causby, 328 U.S. 256, 258, 66 S.Ct. 1062, 1064, 90 L.Ed. 1206 (1946). We need not decide now whether the Warsaw Convention may effect a taking, because the issue may not arise in this case. The question is properly one for the Court of Claims, when and if the Warsaw Convention limitation is applied to these plaintiffs. See Regional Rail Reorganization Act Cases, 419 U.S. 102, 146-47, 95 S.Ct. 335, 359-60, 42 L.Ed.2d 320 (1974). Although the value of plaintiffs' claims against Pan Am has been established,[11] it has yet to be determined whether the impairment of that claim by the Warsaw Convention would constitute a taking. We hold only (1) that plaintiffs have a right to compensation if their claims have been unreasonably impaired by the treaty, and (2) that the Court of Claims has jurisdiction to make that determination and to enforce the right.[12]
 
 IV
 TRIAL ERRORS
 
 37
 Because we cannot uphold the district court's judgment, the case must be remanded for further proceedings. On remand, Pan Am will be required to prove ticket delivery and adequate notice before the Warsaw limitation could be applied.[13] Additionally, plaintiffs urge on their cross-appeal that the district court erred in not admitting certain training records of the aircraft's pilot, and in not allowing plaintiffs' expert to testify as to the pilot's competence and as to whether Pan Am was negligent in allowing the pilot to command the flight in question. Plaintiffs argue that these errors entitle them to a new trial on the issue of willful misconduct.
 
 
 38
 We agree that the court's evidentiary rulings were erroneous and reversible because the excluded evidence could have provided the jury with a basis to find Pan Am guilty of willful misconduct. A verdict of willful misconduct would render the Warsaw Convention limitations inapplicable.
 
 A. Exclusion of Evidence
 
 39
 Plaintiffs sought to prove that Pan Am was negligent in entrusting the aircraft to pilot Zinke because Pan Am knew that Zinke was incompetent and on prior occasions had made errors similar to the error that caused the Bali aircrash. As proof, plaintiffs offered pilot Zinke's training records both as independent evidence and as the basis for the opinion of their expert, Captain Cusmano, that the pilot was incompetent and should not have been allowed to fly the flight in question. Captain Cusmano was permitted to give his opinion as to the cause of the accident based on the events immediately preceding the accident, but he was not permitted to testify about Zinke's competence in general or as to what Pan Am's conduct in light of his incompetence should have been. Plaintiffs intended to rely primarily on the excluded evidence to show willful misconduct on the part of Pan Am.
 
 
 40
 The trial court excluded the proffered evidence on several grounds: 1) that the theory of negligent entrustment had not been raised in the pleadings or preserved in the pretrial order; 2) that the records were too old to be relevant; and, 3) that they were improper evidence of habit or custom.
 
 
 41
 A trial court has broad discretion to admit or exclude evidence, and we review its decision only for abuse of that discretion. Campbell Industries v. M/V Gemini, 619 F.2d 24, 27 (9th Cir. 1980). Even if there is error, reversal is appropriate only if we can say that the error affected the substantial rights of the parties. Fed.R.Civ.P. 61; International Merger and Acquisition Consultants, Inc. v. Armac Enterprises, Inc., 531 F.2d 821, 823 (7th Cir. 1976).
 
 
 42
 First, we do not agree that plaintiffs' theory of negligence was "new." Defendants argue that they were unfairly surprised by the theory because it was not raised in the pleadings, and that the plaintiffs are precluded from relying on it because it was not comprehended in the pretrial order.
 
 
 43
 As to the complaint, all that is required is specificity adequate to give notice to the defendant. Fed.R.Civ.P. 8(a); Trixler Brokerage Co. v. Ralston Purina Co., 505 F.2d 1045, 1050 (9th Cir. 1974); Ross Island Sand & Gravel Co. v. General Insurance Co., 472 F.2d 750, 752 (9th Cir. 1973). The complaint alleges negligence in landing on the part of the crew, and negligence on the part of Pan Am, its agents and employees. Furthermore, Pan Am provided plaintiffs with pilot Zinke's training records during discovery and the records were attached to the pretrial order, to be admitted "without objection save as to relevance." Prior to trial, Pan Am deposed plaintiff's expert, Captain Cusmano. In his deposition, Cusmano stated that, based on the training records, he considered Zinke incompetent. We find that Pan Am had adequate notice that plaintiffs would seek to prove that Pan Am was negligent in allowing pilot Zinke to fly.[14]
 
 
 44
 As to the pretrial order, Pan Am's argument turns on the meaning of the language in "Plaintiffs' Contentions." The relevant portion reads:
 
 
 45
 Plaintiffs contend that Pan Am and the decedent pilots willfully breached their duty to the passenger plaintiffs in the following particulars:
 
 
 46
 ....
 
 
 47
 (1) that all crew members were qualified and competent to conduct the flight of April 22, 1974, designated Flight 812.
 
 
 48
 A fair reading of the order as a whole leaves the clear impression that plaintiffs were contending that Pan Am failed to ensure that all crew members were qualified and competent. There is no other reasonable explanation for the paragraph appearing under "Contentions," rather than under "Admitted Facts." Furthermore, many of plaintiffs' other contentions concern negligence and misconduct on the part of the crew. It is impossible to read these paragraphs consistently with a contention that the crew was competent. Furthermore, pilot Zinke's training records were attached to the order as plaintiffs' exhibits and listed in the order. Pan Am was not misled into believing that the plaintiffs conceded the issue of pilot competence. Accordingly, we find that neither the pleadings nor the pretrial order preclude plaintiffs from presenting evidence of negligent entrustment.
 
 
 49
 The trial court also held that the records were too old to be relevant, and that they were inadmissible evidence of habit or custom. We disagree.
 
 
 50
 The records were the continuous training records of pilot Zinke maintained by Pan Am from 1965 until the date of the fatal accident. Plaintiffs offered to prove, through their expert, that Zinke had demonstrated certain inadequacies as a pilot on several prior occasions, and that, in the opinion of their expert, Pan Am should not have allowed Zinke to pilot the flight in question. This testimony would certainly have been relevant, and for this purpose the records themselves need not be independently admissible. Rule 703 of the Federal Rules of Evidence permits an expert to base an opinion on any facts or data, admissible or not, which are "of a type reasonably relied on by experts in the particular field in forming opinions or inferences upon the subject." As long as plaintiffs can establish that the training records fall into this category, they are entitled to have their expert give an opinion based on them. Bauman v. Centex Corp., 611 F.2d 1115, 1120 (5th Cir. 1980); see United States v. Featherston, 325 F.2d 539, 542-43 (10th Cir. 1963). The trial court's failure to allow Captain Cusmano to testify as to his opinion of Zinke's competence, based on his training records, was error.
 
 
 51
 Furthermore, the records were not inadmissible because they did not meet the standard for evidence of habit or custom. Plaintiffs offered the evidence on two alternate theories. First, the records were offered to show that because pilot Zinke had made similar mistakes on prior occasions, he was likely to have made a mistake on this occasion. For this purpose they may have been inadmissible, as the trial court ruled. See Fed.R.Evid. 404. However, they were also offered to show that Pan Am had notice of Zinke's alleged incompetence, and that it should not have allowed him to fly. For this purpose they are relevant and admissible. See Advisory Committees Notes, Fed.R.Evid. 404 ("... the competency of the driver in an action for negligently entrusting a motor vehicle to an incompetent driver (does not involve the) problem of the general relevancy of character evidence, and the present rule therefore has no provision on the subject."); Breeding v. Massey, 378 F.2d 171, 181 (8th Cir. 1967); 2 Weinstein's Evidence P 404(20). The training records themselves are admissible hearsay under Fed.R.Evid. 803(6) because they are "kept in the course of a regularly conducted business activity." This is not disputed. The trial court was concerned, however, that portions of the records might be double or triple hearsay, and that some might be too old to be relevant. It is open to the trial court on remand to exclude any portion of the records that is inadmissible hearsay, Fed.R.Evid. 802, or that is more prejudicial than probative, Fed.R.Evid. 403.
 
 
 52
 We must conclude that, because the evidence was central to plaintiffs' case, and the legal objections to it were not well-taken, it was an abuse of discretion for the judge not to permit plaintiffs' expert to testify on the issue of pilot competence and Pan Am's negligent entrustment, and to exclude all of the pilot's training records.
 
 
 53
 Plaintiffs proffer an alternate theory for admission of the evidence, which we think has merit. Pan Am's expert Baggott was permitted to testify that all of Pan Am's pilots, and Zinke in particular, were competent. He was also permitted to testify regarding the role of training records in the investigation of an accident, and was cross-examined regarding pilot competence generally. Plaintiffs argue that evidence of Zinke's incompetence is therefore admissible as rebuttal testimony. If Zinke's competence had not been at issue before, Pan Am put it in issue through the testimony of its own expert.[15]
 
 
 54
 For the reasons stated, the judgment of the trial court must be reversed and the case remanded for a new trial on the issue of willful misconduct.[16]
 
 B. Punitive Damages
 
 55
 Plaintiffs contend that they should have been permitted to amend their complaint to state a claim for punitive damages. However, during the pendency of this appeal, this court held that California law does not permit punitive damages in wrongful death actions, and that this is not a denial of equal protection. In re Paris Aircrash of March 3, 1974, 622 F.2d 1315, 1319-20 (9th Cir. 1980). See also, Georgie Boy Mfg., Inc. v. Superior Court, 115 Cal.App.3d 217, 171 Cal.Rptr. 382 (1981) (denial of punitive damages in wrongful death action not violative of state constitution). The trial court was therefore correct in not permitting plaintiffs to amend their complaint.
 
 V
 CONCLUSION
 
 56
 We hold that evidentiary errors mandate a new trial on the issue of willful misconduct.[17] We further hold that the Court of Claims is the proper forum in which to litigate the question of taking if that should become necessary.[18] 28 U.S.C. § 1491.
 
 
 57
 REVERSED and REMANDED for further proceedings consistent with this opinion.
 
 
 
 *
 Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 The provisions of the Warsaw Convention apply only to "international transportation," which is defined in the Convention as
 any transportation in which, according to the contract made by the parties, the place of departure and the place of destination, whether or not there be a break in transportation or a transhipment, are situated either within the territories of two High Contracting Parties, or within the territory of a single High Contracting Party, if there is an agreed stopping place within a territory subject to the sovereignty, suzerainty, mandate or authority of another power, even though that power is not a party to this convention. Transportation without such an agreed stopping place between territories subject to the sovereignty, suzerainty, mandate, or authority of the same High Contracting Party shall not be deemed to be international for the purposes of this convention.
 Art. 1(2), Warsaw Convention, Oct. 12, 1929, 49 Stat. 3000 (1934), 137 L.N.T.S. (1929).
 
 
 [2]
 Article 22 sets a limit of 125,000 French francs for injury to passengers, and 250 francs per kilogram of goods or checked baggage. On the date of the accident, the limitation for personal injury in U. S. dollars was approximately $10,000. In the Matter of Warsaw Convention Liability Limitations as Expressed in U. S. dollars, CAB Order 74-1-16 (Jan. 3, 1974). However, the treaty limitation is expressed in gold "Poincare" francs, and what the present value of the limitations may be, given the increased dollar value of gold, is an open question
 
 
 [3]
 Because the court held the Convention limitations inapplicable to the present suit, it did not reach the issues of notice and ticket delivery. See note 13, infra
 
 
 [4]
 We also note that Virginia apparently does not have an interest in limiting wrongful death recoveries. Although Virginia law placed a $25,000 limit on dollar recoveries at the time the Causey case was filed, the Virginia legislature had already voted to repeal the law. Virginia now places no limit on recovery. Compare, Va.Code Ann. § 8-636 (Cum.Supp.1973) with Va.Code Ann. § 8.01-52 (Cum.Supp.1974)
 
 
 [5]
 We reject plaintiffs' claim that the Warsaw Convention is not a valid treaty of the United States because not ratified. The Constitution requires the Senate's "consent" to a treaty, art. II § 2. The consent appears at 78 Cong.Rec. 11,582 (1934). Were that in error, the Senate has had forty-seven years in which to disclaim its "consent". That it has not done so, we find persuasive
 
 
 [6]
 Pan Am and the United States argue that the Ryder plaintiffs, residents of Australia, have no standing, or limited standing, to raise constitutional objections, citing, e.g., Pauling v. McElroy, 278 F.2d 252, 254 n. 3 (D.C.Cir.1960). The fifth amendment applies to "persons," however, which certainly includes persons who have a valid claim over which our federal courts have jurisdiction. See Wong Wing v. United States, 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896); Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886). Although there are undoubtedly constitutional provisions the protection of which nonresident aliens may not claim, see Johnson v. Eisentrager, 339 U.S. 763, 784-85, 70 S.Ct. 936, 946-47, 94 L.Ed. 1255 (1950), the fifth amendment surely does not permit in a case such as this one, the application of different rules of decision to residents and nonresidents suing on the same cause of action in the same court
 
 
 [7]
 It has been suggested that one who contests the constitutionality of a law which deprives the claimant of some property interest may not "sue in inverse condemnation and thereby transmute an excessive use of the police power into a lawful taking for which compensation in eminent domain must be paid." Agins v. City of Tiburon, 24 Cal.3d 266, 273, 598 P.2d 25, 28, 157 Cal.Rptr. 372, 375 (1979). This does not, however, appear to be the law. Four justices of the Supreme Court have stated that "(t)his holding flatly contradicts clear precedents of (the Supreme) Court." San Diego Gas & Electric Co. v. San Diego, 450 U.S. 621, 101 S.Ct. 1287, 1301, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting). At least one other Justice has expressed agreement with this view. Id. 101 S.Ct. at 1294 (Rehnquist, J., concurring). Justice Rehnquist agreed with the majority that the San Diego case was not appealable for lack of a final judgment, but observed that "I would have little difficulty in agreeing with much of what is said in the dissenting opinion" on the merits. Id. Thus, we take it to be the view of the majority of the Supreme Court that "(t)he general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922) (quoted in San Diego Gas & Electric, 101 S.Ct. at 1302 (Brennan, J., dissenting)). Thus, not withstanding the view of the California Supreme Court, we assume that the excessive exercise of the government's law-making powers may constitute a "taking" under the fifth amendment, for which just compensation must be paid. See, e.g., Penn Central Transportation Co. v. New York City, 438 U.S. 104, 122, 98 S.Ct. 2646, 2658, 57 L.Ed.2d 631 (1978); Goldblatt v. Town of Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962); United States v. Central Eureka Mining Co., 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958)
 
 
 [8]
 It might be argued that if the Warsaw Convention creates a cause of action, as at least one circuit has held, Benjamin v. British European Airways, 572 F.2d 913, 918-19 (2d Cir. 1978), the right asserted is "dependent upon" the treaty. But see Maugnie v. Compagnie Nationale Air France, 549 F.2d 1256, 1258 n.2 (9th Cir. 1977). However, the Convention has never been read to limit plaintiffs to a cause of action arising thereunder, but rather to limit the recovery in suits for injury. See Warsaw Convention, supra note 1, at art. 24
 
 
 [9]
 The right to wrongful death recovery is also a feature of the federal common law, Moragne v. States Marine Lines, 398 U.S. 375, 409, 90 S.Ct. 1772, 1792, 26 L.Ed.2d 339 (1970), and its denial the exception, id. at 393, 90 S.Ct. at 1783
 
 
 [10]
 The Supreme Court, in a footnote to Duke Power, observed that "(a) person has no property, no vested interest, in any rule of the common law." 438 U.S. at 88 n.32, 98 S.Ct. at 2638 n.32 (quoting Second Employers' Liability Cases, 223 U.S. 1, 50, 32 S.Ct. 169, 175, 56 L.Ed. 327 (1912)). The cases cited for this proposition, with one exception, dealt with statutes creating, not extinguishing, liability. Silver v. Silver, 280 U.S. 117, 50 S.Ct. 57, 74 L.Ed. 221 (1929), the one exception, dealt with an automobile guest statute, which barred liability. In that case, however, the due process question was not raised, and the statement quoted is pure dictum
 Furthermore, we are not dealing here with a change in a rule of the common law. Plaintiffs are not complaining of a change in law, but of the limitation of an independently existing right under state law. By the same token, plaintiffs in Dames & Moore and Duke Power held or would hold claims created by the operation of state law. The Constitution does not create property rights; it merely forbids the extinguishment of those rights. The source of property rights is necessarily common law or statute, usually state statute. This is precisely the type of property to which the fifth amendment is addressed, as the Supreme Court implicitly recognized in Duke Power, 438 U.S. at 94 n.39, 98 S.Ct. at 2641 n.39.
 The Court further observed that "statutes limiting liability are relatively commonplace and have consistently been enforced by the courts." Id. at 88 n.32, 98 S.Ct. at 2638 n.32. The cases cited for this proposition are most notable for their lack of authority. Silver v. Silver, 280 U.S. 117, 50 S.Ct. 57, 75 L.Ed. 221, presented an equal protection challenge to an automobile guest statute. Several states have since decided that Silver is no longer good law, and that guest statutes are unconstitutional. E.g., Thompson v. Hagan, 96 Idaho 19, 523 P.2d 1365 (1974); Henry v. Bauder, 213 Kan. 751, 518 P.2d 362 (1974); Laakonen v. Eighth Judicial District Court, 91 Nev. 506, 538 P.2d 574 (1975); McGeehan v. Bunch, 88 N.M. 308, 540 P.2d 238 (1975). Providence & New York S.S. Co. v. Hill Mfg. Co., 109 U.S. 578, 3 S.Ct. 379, 27 L.Ed. 1038 (1883) involved no constitutional challenge to the limitation of a vessel owner's liability, and the court noted that the limitation dated from "time immemorial." Id. at 593, 3 S.Ct. at 388. Indemnity Ins. Co. of North America v. Pan American Airways, 58 F.Supp. 338 (S.D.N.Y.1944), involved a due process challenge to the Warsaw Convention, that was rejected in a single sentence.
 
 
 [11]
 We note that the right to just compensation entitles the claimant to the full pecuniary value of his claim. United States v. Reynolds, 397 U.S. 14, 15-16, 90 S.Ct. 803, 804-805, 25 L.Ed.2d 12 (1970). Plaintiffs' damages have already been determined by the jury, so the value of their claim is not an issue
 
 
 [12]
 There is no danger that the statute of limitations will have run before plaintiffs can bring a suit in the Court of Claims, because no taking will have occurred until the Warsaw limitation is applied to them, if it ever is
 
 
 [13]
 We note that adequate notice to the passenger requires delivery of a ticket to him "in such a manner as to afford him a reasonable opportunity to take self-protective measures." Mertens v. Flying Tiger Line, 341 F.2d 851, 857 (2d Cir.), cert. denied, 382 U.S. 816, 86 S.Ct. 38, 15 L.Ed.2d 64 (1965). See also Warren v. Flying Tiger Line, 352 F.2d 494, 498 (9th Cir. 1965). Inconspicuous and hypertechnical "notice" may not satisfy this requirement. See Lisi v. Alitalia-Linee Aeree Italiane, 370 F.2d 508, 512-14 (2d Cir. 1966). The current notice required by the CAB informs passengers that recovery "is limited in most cases to proven damages not to exceed U. S. $75,000 per passenger ..." on trips having an "agreed stopping place in the United States of America," or "in most cases to approximately U. S. $10,000 or U. S. $20,000" on other international trips. CAB Form 263 (Jan. ----, 1976). We need not decide here whether the notice required by the CAB is adequate to advise a passenger of the effect of the limitation. What notice was actually given and the manner of its display on tickets is not in the record before us
 
 
 [14]
 The trial court conceded that such an interpretation was possible, but that it was also possible to read the complaint as alleging only a theory of respondeat superior. Complaints are of necessity framed in general terms, and if both readings were possible, plaintiffs should have been allowed to pursue both theories. Fed.R.Civ.P. 8(a), (f); Conley v. Gibson, 355 U.S. 41, 47-48, 78 S.Ct. 99, 102-103, 2 L.Ed.2d 80 (1957); Trixler Brokerage Co. v. Ralston Purina Co., 505 F.2d 1045, 1050 (9th Cir. 1974); Janke Const. Co. v. Vulcan Materials Co., 527 F.2d 772, 776-77 (7th Cir. 1976)
 
 
 [15]
 Baggot's testimony also belies Pan Am's contention that it was not prepared to counter evidence of Zinke's incompetence
 
 
 [16]
 Pan Am contends that the trial judge should have recused himself because of bias or prejudice against Pan Am. Pan Am has identified no prejudice to their case thus far resulting from an unsubstantial allegation of bias
 
 
 [17]
 There need be no new trial on damages
 
 
 [18]
 We need not face here the novel question of whether plaintiffs might proceed directly to the Court of Claims without first retrying the willful misconduct claim in district court. We suggest only that a taking might not have occurred where plaintiffs have available remedies against a private wrongdoer that have not been exhausted