AMERICAN SAMOA GOVERNMENT
ex rel. AFAESE UIKIRIFI, Plaintiff

v.

HAWAIIAN AIRLINES, Inc., Defendant

AMERICAN SAMOA GOVERNMENT
ex rel. GEORGE NERU, Plaintiff

v.

HAWAIIAN AIRLINES, Inc., Defendant

High Court of American Samoa
Trial Division

CA No. 35-88
CA No. 36-88

February 16, 1989

Before KRUSE, Chief Justice, TAUANU'U, Chief Associate Judge, and TUIAFONO, Associate Judge.

Counsel: For Plaintiff, Tauivi Tuinei
For Defendant, Charles Ala`ilima

### Facts

Plaintiff Uikirifi made two trips on Hawaiian Airlines (hereinafter "Hawaiian") from Honolulu to Pago Pago. On an August 7, 1987 trip, Hawaiian lost two bags containing clothing which plaintiff valued at $1,926.64. On September 17, 1987 nine pieces of luggage valued by plaintiff at $5,055.24 were lost. Four boxes were said to contain 227 fine mats which the plaintiff valued at $2,270.00. The other five bags contained clothing. The District Court awarded plaintiff $1,929.00 on the first claim and $4,999.00 on the second.

Plaintiff Neru traveled on Hawaiian on February 8, 1987. He carried with him four pieces of baggage, two of which were lost. They contained auto parts that plaintiff valued at $2,286.70. The District Court awarded plaintiff relief in that sum.

Hawaiian has appealed these decisions maintaining that certain contractual clauses either bar or substantially limit the claims of Uikirifi and Neru.

### Discussion

During the past decade the airline industry has undergone substantial deregulation and the tariff structure which airlines once could rely on to limit their baggage liability no longer exists. See 49 U.S.C. § 1551. At the outset, therefore, we reject any suggestion that these cases may be simply disposed of because the baggage liability limitations at issue are "tariffs" that have the force and effect of law in binding passengers. This is not to say, however, that this Court is left to its own devices and that the contract law of American Samoa is all that we need look to in interpreting the contract of carriage which lies at

35

the heart of this controversy. There are rather detailed federal regulations which regulate the area of baggage liability,[1] and even in areas not covered explicitly by federal rules, applying territorial law does not seem appropriate because of the "continued federal interest in air transportation." See Arkwright-Boston Manufacturers Mutual Insurance Co. v. Great Western Airlines, Inc., 767 F.2d 425, 427 (8th Cir. 1985). Federal common law should provide the rule of decision in these cases.

There are three major issues for decision. First, Hawaiian argues that it is absolved of any liability for the loss of these passengers' bags because of contractual provisions purporting to exclude the classes of items Uikirifi and Neru carried from liability. Second, Hawaiian maintains that even if it has some liability, it is limited to $1250.00 per passenger because of compliance with federal regulations that allow limitations of liability to be incorporated by reference into air carriage contracts. Finally, plaintiffs contend that, even if Hawaiian's limitation of liability conformed to applicable federal regulations, the

---

[1] These regulations were promulgated by the Civil Aeronautics Board. Although the particular statutory authority under which the regulations were promulgated is unclear, former 49 U.S.C. § 1374(a) provides ample room for the promulgation of these regulations. That provision provides, in part, that carriers are to provide "adequate service." This clause has been interpreted broadly enough to include regulation of smoking on aircraft as a factor of adequate service. Diefenthal v. Civil Aeronautics Board, 681 F.2d 1039, 1044-46 (5th Cir. 1982), cert. denied 459 U.S. 1107 (1983). Clearly, then, baggage liability would also be subject to regulation under that interpretation of "adequate service." The C.A.B. no longer exists, having been deregulated out of existence. However, its authority to regulate in the areas of "safe and adequate service" has been transferred to the Department of Transportation. 49 U.S.C. §§ 1551(a)(4)(C), 1551(b)(1)(E). Thus, the Congress has expressed its concern that these areas remain subject to direct federal regulatory control.

common law "released value" doctrine supersedes the limitation of liability and allows them full recovery.

## I. Exclusions from Liability

Hawaiian maintains that certain contractual provisions release it from any liability for the lost bags. Almost half of Uikirifi's claim from the September 17, 1987 flight was for lost fine mats. The contract states that Hawaiian "assumes no liability for irreplaceable articles and/or valuable items including but not limited to . . . religious or ceremonial mats and artifacts." Rule 26 (B)(2), Terms of Contract of Carriage, at 49 (April 9, 1987). Accordingly, Hawaiian maintains it is not liable at all for loss of the fine mats. Hawaiian also states that it has no liability for the rest of Uikirifi's luggage and all of Neru's bags because they contained business goods, not the "personal effects" which Hawaiian had contracted to carry. Appellant's Memorandum, Hawaiian Airlines v. American Samoa Government ex rel. Langford, CA No. 37-88, at 7 (Sept. 19, 1988). Finally, Hawaiian contends that the "restriction of certain items from any liability was specifically approved by the CAB [Civil Aeronautics Board]." Id., citing Civil Aeronautics Board, Final Rule on Part 254--- Domestic Baggage Liability, ER-1374, at 6 (December 23, 1983), reprinted in Air Transport Association of America, Memorandum No. 84-10 re: Domestic Baggage Liability (February 10, 1984) [hereinafter ER-1374].

To deal with Hawaiian's last point first, the Civil Aeronautics Board [C.A.B. or Board] did not "specifically" approve such limitations as are present here. Rather, the Board required that carriers seeking to incorporate by reference terms of contract include with their tickets a notice of any "'[l]imits on the air carrier's liability . . . for loss, damage, or delay of goods and baggage, including fragile and perishable items.'" ER-1374, supra, at 6, citing 14 C.F.R. § 253.5 (b)(1). As is discussed in Part III below, a "limit" on the amount of a carrier's liability does not mean the same thing as the exclusion of all liability. We assume that the Board, which was conscious of this difference (see Part III, infra), did not intend to use "limit" in the sense suggested by Hawaiian.

As to the argument that liability is contractually limited to "personal effects" to the exclusion of "business goods," we see the agreement quite differently.[2] Firstly, we could not find an explicit exclusion for "personal effects" in the contract, although the contract does explicitly disclaim liability for certain items --- such as fine mats. It would appear reasonable to us, therefore, that if "business goods" were meant to be excluded from liability an explicit exclusion for "business goods" would have been provided as well.[3]

At the same time, another clause provides that Hawaiian will "<u>accept</u> for transportation as baggage, such personal property as is necessary or appropriate for the wear, use, comfort, or convenience of the passenger for the purpose of the trip." Rule 19 (A), Terms of Contract of Carriage, at 30 (November 23, 1987) (emphasis added). Two observations may be made about this clause. First, the positive does not always imply the negative. Second, even accepting Hawaiian's reading, having once "broken" its own condition of carriage, Hawaiian should not now be heard to say that it takes no responsibility for that which it has carried. <u>Cf. Klicker v. Northwest Airlines, Inc.</u>, 563 F.2d 1310, 1316 (9th Cir. 1977) ("If the airline erred in accepting the animal, the responsibility for the mistake falls on the airline, not on the innocent shipper.") This is especially so given the extent of the class of goods sought to be excluded by Hawaiian's suggested

---

[2] In the <u>Neru</u> case, plaintiff concedes that the automobile parts were bought for resale. In <u>Uikirifi</u>, Hawaiian maintains that the amount of clothing bought by plaintiff indicates that he intended to resell the clothes. Although Uikirifi characterized the items as "family shopping" in his claim form, we accept for the purposes of analysis Hawaiian's contention.

[3] As defendant supplied the myriad terms of contract, in choosing between reasonable interpretations of the contract, we opt for that construction which operates against the draftsman. <u>See</u> Restatement (Second) of Contracts § 206.

interpretation of this clause.[4] In fact, the contractual baggage liability clause states simply that Hawaiian "shall be liable for the provable loss of, damage to, or delay in the delivery of a fare-paying passenger's baggage, or other property." Rule 26 (A)(1), Terms of Contract of Carriage, at 49 (April 9, 1987). Nowhere here is it mentioned that Hawaiian is responsible only for "acceptable" baggage or for "personal" property or effects.

Furthermore, we find that the items questioned come within the definition of "acceptable" baggage. We find listed in another section of the contract several items that Hawaiian will only transport subject to a disclaimer of liability for any damage caused to such items due solely to their fragile nature. This class of fragile items includes "[a]dvertising displays, models, sketches, blueprints and maps" and "[m]icroscopes, oscilloscopes, meters, counters and polygraphs." Rule 20 (L)(3)(e), (L)(3)(h), Terms of Contract of Carriage, at 33 (January 1, 1983). If indeed responsibility for "personal" items were all that was envisaged by the contract, then "personal" items would thus seem to include a polygraph machine or advertising model, if the contract is to be consistently interpreted. We find it hard to imagine a logical definition of "personal use" which could differentiate between a polygraph machine or advertising model and auto parts or clothing for resale. We accordingly conclude that recovery for clothing and auto parts even where they are for "business purposes" is not excluded.

Finally, even if we were to concede that the contract does reasonably attempt to exclude all liability for the clothing and auto parts, the exclusion is void for violating public policy. In Klicker v. Northwest Airlines, Inc., the Ninth Circuit held invalid an airline tariff which purported to exclude all liability for damage due

_____

[4] The net effect of Hawaiian's position simply fails to address the possibilities, indeed the realities, that some people who use its air service do so in furtherance of a business purpose and therefore it is not unlikely that accompanying baggage of the business traveller will have something to with that business purpose.

to the death of an animal transported as baggage. 563 F.2d 1310, 1312-14 (9th Cir. 1977). The Court first explained that under the common law, carriers were not allowed to exculpate themselves from liability for their own negligence. Id. at 1312. Otherwise "`"[a] carrier who stipulates not to be bound to the exercise of care and diligence 'seeks to put off the essential duties of his employment.'"'" Id. at 1313, quoting New York, New Haven and Hartford Railroad Co. v. Nothnagle, 346 U.S. 128, 136 (1953) (emphasis in original) (other citations omitted). The Court reasoned that allowing the airline to exclude all liability for damage to animals which it accepted as baggage would violate this rule even where a tariff had been filed with and approved by the C.A.B. Id. at 1314.[5]

Prior to Klicker, the Second Circuit had issued decisions which arrived at the opposite conclusion. These decisions disallowed recovery for jewelry contained in lost baggage, reasoning that the airline tariffs excluding liability for jewelry had been approved by the C.A.B., and that such tariffs had the force and effect of law. Tishman & Lipp, Inc. v. Delta Air Lines, 413 F.2d 1401, 1403-04 (2d Cir. 1969); Lichten v. Eastern Airlines, 189 F.2d 939, 941 (2d Cir. 1951). The Klicker decision cast doubt on the reasoning of these Second Circuit decisions. The court went so far as to say that it declined to follow the rationale of Tishman & Lipp and Lichten because "it is flatly wrong," Klicker, supra at 1314, and noted that Lichten had "been uniformly criticized by commentators." Id. at n.6.

A choice between these two lines of authority is unnecessary for our purposes. It is important to note that even the Lichten court acknowledged that it was "the common law rule that a common carrier may not by contract relieve itself from

_____

[5] By the time that the case reached the appellate level, the C.A.B. had invalidated the tariffs in question as unreasonable. This, however, would not have helped the plaintiffs as the tariff was in full force at the time they traveled and it would take a judicial determination that the tariff had been void as against public policy to give them relief. Id. at 1313.

liability for the consequences of its own negligence." Lichten, supra at 941. Thus, the Lichten decision did not question the principle of law that concerns us here. Instead, it was grounded on the court's interpretation of the effect regulation of airlines by the C.A.B. had on that rule. Id. In an era of deregulation, where neither the C.A.B. nor the tariffs considered by the Lichten court exist, it seems clear that exculpatory contractual clauses such as those in question here are no longer valid.

Here, Hawaiian has attempted to exculpate itself from any liability in carrying the enumerated goods --- including, presumably, liability for the intentional acts of its employees. The clause therefore, as it attempts to exclude responsibility for the loss of these "business goods," is void. Of course, this reasoning applies equally to the attempted exclusion of plaintiff Uikirifi's ceremonial fine mats.

## II. Limitation of Liability to $1250

Hawaiian seeks to limit its liability for lost baggage through incorporating by reference a contractual term setting a maximum recovery of $1250 per passenger for loss of baggage. A passenger may avoid the $1250 limit by declaring a higher value for his baggage and paying an excess valuation charge of $1.00 for each additional $100 worth of baggage. Rule 26 (A)(1), Terms of Contract of Carriage, at 49 (April 9, 1987).

To so limit its liability, Hawaiian is required to comply with two sets of federal regulations --- 14 C.F.R. Parts 253 and 254.[6] The former establishes the method by which airlines may incorporate by reference terms of a contract of carriage. The latter establishes specific rules relating to notice of limitation of baggage liability.

---

[6] As we will see in Part III, in some circumstances limiting liability to a fixed amount is not considered to be the same as an attempt at exculpation and may be valid.

41

## A. Incorporation by Reference

Federal regulations specifically allow an airline in interstate transportation to incorporate by reference terms of its contract so long as proper notice of such incorporation is given the passenger. 14 C.F.R. § 253.4. When such notice is given, local law is preempted and the local authorities cannot require disclosures beyond those federally required. Id. § 253.1. As it here concerns us, the regulations first require each airline seeking to incorporate by reference terms of contract to provide a "conspicuous notice" that any terms incorporated by reference are part of the contract. Id. § 253.5 (a). The regulations further require notice that the contract of carriage incorporates by reference "[l]imits on the air carrier's liability . . . for loss, damage, or delay of goods and baggage." Id. § 253.5(b)(1). If such notice is not given, the carrier may not claim the benefit of the incorporated baggage liability limitations. Id. § 253.4 (a).

Here, it is clear that language appears on the ticket which fulfills the substantive requirements of Part 253. The second page of the ticket following the flight coupons contains a notice that the air transportation "is subject to the individual terms of the transporting air carriers, which are herein incorporated by reference and made part of the contract of carriage." Exhibit 4, Hawaiian Airlines v. American Samoa Government ex rel. Neru, CA 36-88 (August 4, 1988). Thus the requirement of section 253.5 (a) is met. There is a further notice that the incorporated terms include "[l]imits on liability for baggage, including fragile or perishable goods." This then conforms to the requirements of section 253.5(b)(1).

The question, then, is whether these notices constitute "conspicuous notice" of the incorporated terms. We were not able to find any cases that have dealt directly with what constitutes "conspicuous notice" within the meaning of 14 C.F.R. § 253.5. However, cases decided under the Warsaw Convention have dealt with a similar issue in an analogous context and should be helpful in defining "conspicuous notice." There is also one helpful case involving the adequacy of notice at a time when a tariff required such notice.

42

When its requirements are complied with, the Warsaw Convention[7] limits liability of carriers in international transportation by air for loss, delay, or damage to a passenger's baggage; for personal injury or death of passengers; and for air ·freight shipments. Warsaw Convention, arts. 17-19. As a prerequisite to obtaining the benefits of limited liability, the carrier must provide the passenger or shipper with a ticket, baggage check, or air waybill (as the case may be) which contains a "statement that the transportation is subject to the rules relating to liability established by this convention." Id., arts. 3(e), 4(h), 8(q). Courts interpreting these provisions have held that the "statement" contemplated by the Convention must be more than "[i]nconspicuous and hypertechnical 'notice.'" In re Aircrash in Bali, Indonesia on April 22, 1974, 684 F.2d 1301, 1313 n.13 (9th Cir. 1982). Rather, courts have held that as the quid pro quo for the Convention's substantial limitations on recovery of damages, the documents involved must give the passengers "adequate notice" of the applicability of the Convention so that they might take self-protective measures such as purchasing additional coverage. Lisi v. Alitalia-Linee Aeree Italiane, S.p.A., 370 F.2d 508, 513 (2d Cir. 1966).

Not surprisingly, the factors which the courts have found important in deciding what is "adequate notice" under the Warsaw Convention bear a close relation to what one might intuitively expect to constitute "conspicuous notice." These include print size, type of print, legibility, and placement of the message.

In Lisi, the notice warning passengers about the applicability of the Warsaw Convention was:

"camouflaged in Lilliputian print in a thicket of 'Conditions of Contract' . . . Indeed the exculpatory statements on

---

[7] Convention for the Unification of Certain Rules Relating to International Transportation by Air, opened for signature Oct. 12, 1929, adhered to by the United States June 27, 1934, 49 Stat. 3000, T.S. No. 876, reprinted as note to 49 U.S.C.A. sec. 1502 [hereinafter Warsaw Convention].

which defendant relies are virtually invisible. They are ineffectively positioned, diminutively sized, and unemphasized by bold face type, contrasting color, or anything else. The simple truth is that they are so artfully camouflaged that their presence is concealed."

Lisi at 514, quoting the decision of the lower court at 253 F.Supp. 237, 243 (S.D.N.Y. 1966).

In addition, on the front of the ticket and the baggage check a message drawing the passengers attention to the actual notice was printed in "exceedingly small print." Id. at 513. Accordingly, the appellate court affirmed the trial court's decision granting plaintiff's motion for summary judgment to strike defendant's Warsaw Convention defense. (A reproduction of the ticket involved in Lisi can be found at 253 F.Supp. 237, 240-42.)

In another illustrative case where the warning given was found inadequate, the first notice that the ticket was subject to the Convention found in a footnote to the face of the ticket was "in exceedingly small, almost unreadable (4 1/2 point) print." Egan v. Kollsman Instrument Corp., 234 N.E.2d 199, 200 (N.Y. 1967), cert. denied 390 U.S. 1039 (1968). On the outside back cover of the ticket "likewise printed in miniscule [sic] type" appeared some Conditions of Contract which included a statement that the transportation was subject to the Convention. Id. at 200 n.1. A final notice was "in such exceedingly small and fine print as almost to defy reading." Id. at 203. The court concluded that even though the airline had literally complied with the Convention notice requirement, this was nevertheless insufficient and not in accord with the overall purposes of the notice regime because "a statement which cannot reasonably be deciphered fails of its purpose and function of affording notice and may not be accepted as the sort of statement contemplated or required by the Convention." Id. at 203. The appellate court reversed the trial court's denial of plaintiff's motion to dismiss the defendant's affirmative defense grounded on the Convention.

The courts have also upheld the applicability of the Convention against claims that the notice

44

provided was inadequate. One court did so because the "printing on the back of the ticket and baggage check in this case, though small, is certainly readable." Parker v. Pan American World Airways, Inc., 447 S.W.2d 731, 735 (Tex. Civ. App. 1969) (affirming limitation of passenger's claim to the Convention amount). In another case:

> each sheet of the five page ticket issued to appellees contained three warnings that the provisions of the Warsaw Convention applied to international flights. The reverse side of each sheet contained one warning in type about twice the size of the rest of the printing on the page. The other warning, on the reverse side, was in bold-face type in the body of the "Conditions of Contract."

Trans World Airlines, Inc. v. Christophel, 500 S.W.2d 409, 410-11 (Ky. 1973) (reversing lower court decision and ordering j.n.o.v. for appellant).

Finally, another court held that because an air waybill had notice of the applicability of the Convention "in bold face, easily legible type placed directly above the space wherein Mr. Tobin affixed his signature" the message was adequate notice of the applicability of the Convention as a matter of law. Bianchi v. United Air Lines 587 P.2d 632, 635 (Wash. App. 1978).

The last case of interest to us was not under the Warsaw Convention but under former C.A.B. tariffs. The ticket in question had the notice of domestic baggage liability limitations below a paragraph that had the bold-faced heading "Advice to International Passengers on Limitation of Liability." Greenberg v. United Airlines, Inc., 414 N.Y.S.2d 240, 240 (1979) (emphasis added). The court held that "[a]ny reasonable person, let alone a harried tourist, would conclude that the described page, under its top line, applies solely to international passengers." Id. at 241. The court continued that "[a] notice so elusive cannot fulfill the office provided for it in the tariff. In order to succeed defendant's communication must be positioned and identified so as to penetrate the traveling public's reasonably focused consciousness. Instead, defendant has set before the

traveler a morsel of nourishment hidden in a banquet of dust." Id.

In this scheme of things, it is clear that defendant's Notice of Incorporated Terms is "conspicuous." The print is not small, and it is certainly legible. Cf. Egan, supra (4 1/2 point type). Also, there is a bold-faced heading which announces the content of the notice which follows. Cf. Bianchi, supra, and the suggestion of Lisi. Moreover, although the particular notice of baggage liability limitations is buried in the midst of five other specific notices, it is important to note that each of these other notices is also required by regulations. Given the fact that the C.A.B. has specifically referred to the advantages of short form ticketing (see Part III below), it would be hard to do this with a message much larger than that here. Also, if the message ran on to several pages because it were in larger type, the airline would potentially be accused of obscuring the notice by burying it in a morass of pages. Finally, the page is the first thing a passenger would see once she got past the flight coupons. In that sense then it is effectively positioned. Cf. Greenberg, supra.

### B. Notice of Baggage Liability Limits

However, for Hawaiian to successfully limit its baggage liability merely providing notice of incorporation by reference would not be enough. According to 14 C.F.R. § 254.5 Hawaiian must also:

> provide to passengers, by conspicuous written material included on or with its ticket, either:
> (a) Notice of any monetary limitation on its baggage liability to passengers; or
> (b) The following notice: "Federal rules require any limit on an airline's baggage liability to be at least $1250 per passenger."

There are two places on the ticket and accompanying material dealing with baggage liability limitations. First, on the ticket itself. Second, on the ticket jacket. In analyzing each of these statements, the first question to ask is whether Hawaiian provided such a notice at all and then whether it was the

46

"conspicuous written material" required by the enactment.[8]

In our opinion, although the notice provided on the ticket itself is sufficiently "conspicuous,"[9] its <u>content</u> renders it inadequate. The notice states that:

> Liability for loss, delay, or damage to baggage is limited as follows unless a higher value is declared in advance and additional charges are paid: . . . . (2) For travel wholly between U.S. points, to $1250 per passenger on most carriers (a few have lower limits).

Exhibit 4, <u>Neru</u>, <u>supra</u>.

The notice does not comply with 14 C.F.R. § 254.5(b) since it deviates in several material respects from the federally prescribed language of that subsection. Additionally, we do not think it fulfills the requirement of section 254.5(a). Instead of stating the "monetary limitation on <u>its</u> baggage liability to passengers," (emphasis added),

---

[8] Although section 253.5 speaks of "conspicuous notice" and 254.5 of "conspicuous written material," we do not think that there is a relevant difference between these two phrases on the facts of this case and will treat them as synonyms. There might be a valid difference if, for example, an airline gave "conspicuous notice" by orally informing each passenger of the areas of incorporated terms. This would seemingly not satisfy the "conspicuous written material" requirement on baggage liability. However, on the facts of this case there is no reason to treat them differently.

[9] The notice is conspicuous because it is in fairly large type, easily legible by one who gets that far into the ticket, and has a bold-face heading which would draw attention to the statement. Basically, there is not that much more that an airline can do to make this more conspicuous without using individual sign-offs, larger format tickets, or similar devices which the C.A.B. has in effect said they need not do. (See below.)

the ticket clause states a hypothetical limitation on "most carriers" without indicating what this carrier's liability limitations are. The difference is not merely semantic. A traveller deciding whether to buy additional baggage coverage must make his decision on the basis of what he might recover without that additional insurance. Where the airline does not provide notice of its actual limitation, the customer cannot choose properly. That the importance of this distinction was understood during the rulemaking process seems clear when we consider that when the C.A.B. promulgated 14 C.F.R. § 254.5 it stated that it found the inclusion of either "(1) the Board-mandated notice, or (2) a specific statement of its actual liability limitation" preferable to "a general notice that liability may be limited." ER-1374, supra, at 6 (emphasis added). Although the notice provided on the ticket is more than a "general notice," in our opinion it seems closer to being a "general notice" than a "specific" statement of "actual" liability limitations.

Hawaiian's ticket jackets also include a notice of baggage liability limitation. The language here unambiguously sets forth Hawaiian's actual limitation. It states:

> Liability for loss or damage: not over $1250 per passenger unless higher value declared in advance. Charge for higher value declared $1.00 per $100 (up to $2,500).*
>
> *Not liable for fragile or valuable articles.

Exhibit 11, Hawaiian Airlines v. American Samoa Government ex. rel. Uikirifi, CA No. 35-88 (August 4, 1988); Exhibit 5, Hawaiian Airlines v. American Samoa Government ex rel. Neru, supra.

However, it is less clear that the language of limitation on the jackets is the "conspicuous written material" required by the regulation.

Hawaiian uses at least two different types of ticket jackets. In one version, the baggage liability limitation is behind the flap in the ticket jacket in which one puts the ticket. (Hereinafter referred to as Type 1 jacket.) The contractual terms here appearing would ordinarily

be hidden from view by the passenger's ticket. Presumably the ticket will be placed in that part of the jacket designed for ticket placement. The design of this ticket jacket is inconsistent with conspicuousness; it naturally encourages the passenger to block from view the terms of contract. In Greenberg, supra, the court talked about positioning the message so that it penetrates the consciousness of the traveling public. This message would not.

We are mindful of the fact that the front of the flap has a boldface and capitalized message that says "FOR BAGGAGE INFORMATION LIFT FLAP." Even though it is the largest sized print on that page, this alone does not render the limitation of liability "conspicuous." It does not indicate what sort of "baggage information" is to be imparted--- it could just as well refer to size and weight limitations as to liability limitations. More importantly, the jacket's design just does not encourage the message to be found.

The other ticket jacket used by Hawaiian (hereinafter referred to as Type 2 jacket) has the baggage liability limitation on an inside page of the jacket. Perhaps some may say that this message is not as eye catching as it could be, but we find the same conspicuous.[10] The typeface, though small, is legible. See Parker, supra. Also, the

---

[10] There would be any number of ways that Hawaiian could have made the limitation more conspicuous --- e.g., using larger type, bold print throughout, or putting the message on the jacket cover itself next to the seat information. However, it is easy to say that things could be made more conspicuous. The question that needs to be answered is whether what was provided was conspicuous enough. Also, in answering this question, we have to be careful to remember that some of the rest of the material on the jacket is required by other federal regulations. If too much attention is drawn to this provision, then less will be drawn to such things as, for example, the notice on overbooking of flights. We should not place the defendant in the situation of having to choose to comply with one set of regulations at the expense of noncompliance with another.

message is at the top of the flap and set out in its own box. Thus the notice is not buried in a mass of other information as the information was in Lisi or Greenberg. Finally, a bold face message asking the passenger to "PLEASE NOTE" precedes it. (This last factor may not immediately appear that impressive considering there is a plethora of such "Notes"-s and "Notice"-s on the jacket. An attempt, however, to be eye catching is certainly better than no attempt at all.)

In summary, our conclusions with regard to ticket jackets are that the Type 1 jacket is inadequate notice while the Type 2 jacket is adequate notice.

Having so concluded, we consider the evidence presented. In Uikirifi, the evidence indicates that plaintiff took two flights. Yet only one ticket jacket was introduced into evidence. That ticket jacket, exhibit 11 in CA No. 35-88, is a Type 2 jacket --- the kind which provides adequate notice. On the extent of our record, and mindful of plaintiff's burden of proof, we hold on the evidence before us, that the Type 2 jacket was the applicable jacket issued on both flights. (We note that Judge Sunia's findings below appear to be premised on Uikirifi having received a Type 1 jacket. Judge Sunia found the baggage liability limitation inadequate because it was located "underneath the flap," Findings of Facts, Conclusions of Law, and Order, American Samoa Government ex. rel. Uikirifi v. Hawaiian Airlines, CA No. 63-87, at 2 (District Court, March 2, 1988). Notwithstanding this, since these matters have come to us by way of trial de novo, Rule 14 D.C.R., it is our record of the evidence that must govern our findings.) At this juncture, then, Uikirifi's recovery would seem to be limited to $1250 per flight.

Now, turning to the ticket jacket in the Neru case, the jacket introduced into evidence here was a Type 1 (underneath the flap) jacket --- i.e., providing inadequate notice. Section 254.5 does not state what consequences befall an airline which does not provide conspicuous notice of its liability limitations. However, the logical implication is that the airline would lose its contractual right to limit its baggage liability. Essentially, the statutory provisions having been rendered inapplicable by the absence of notice,

there is a reversion to the common-law liability of common carriers. Under the common law, only in very narrow circumstances could the carrier escape liability for loss of or damage to a customer's baggage. See discussion infra. Even if this were not the necessary result of failure to provide adequate notice under section 254.5, it is the result contemplated by the parties' contract. The contractual provision limiting liability to $1250 specifically states that this level of "maximum liability shall be waived for an individual claimant where it can be shown that with respect to that claimant HA [Hawaiian Airlines] failed to provide notice of limited liability for baggage." Rule 26 (A)(1), Terms of Contract of Carriage, at 49 (April 9, 1987). Given the regulatory framework Hawaiian operates under, it seems logical to treat the "notice" referred to in the contract as being synonymous to the "conspicuous" notice required by the regulations. Accordingly, we find that Neru is entitled to recover the full extent of his damages. Neru's unrebutted testimony valued his loss at $2,286.70. Because the items lost were all new, there is no question of depreciation and we find that Neru is entitled to that amount.

### III. Released Value Doctrine

Having found that Uikirifi was provided sufficiently "conspicuous" notice to meet the requirements of 14 C.F.R. § 254.5, we next consider whether or not the "released value doctrine" affects the limitation of liability asserted against Uikirifi.

As noted above, the common law prohibited any attempts by carriers to exculpate themselves from all liability for their own negligence. Notwithstanding, federal common law developed the "released value" doctrine which essentially permitted a carrier to limit its liability for loss to the agreed value of property shipped in circumstances where the rate charged is related to the value of the shipment. See First Pennsylvania Bank v. Eastern Airlines, Inc., 731 F.2d 1113 (3d Cir. 1984). The doctrine is nicely capsulized in that court's conclusions.

> [U]nder federal common law, the authority of a common carrier to limit its liability for the loss of the goods in its care is governed by the "released

51

value doctrine," under which a carrier may limit its liability to the agreed value of the goods, provided that the shipper has the option of obtaining coverage for the full value of its goods, is made aware of that option, and knowingly chooses to pay a lower price for the lesser coverage.

Id. at 1122.

Without the released value agreement, the carrier's liability under common law principles would equal the actual value of the property. Id. at 1116. Thus, when the carrier gave the shipper the chance to choose the higher fare --- which bought with it full liability coverage --- over the lower fare--- with its correspondingly lower coverage --- the passenger would be estopped from asserting the carrier's common law liability. One recent air shipment case has held that the carrier must give "'reasonable notice'" to the shipper of his options and that the shipper must make "'an absolute, deliberate and well-informed choice'" of the lower fare with its lower liability. Fireman's Fund Insurance Cos. v. Barnes Electric, Inc., 540 F.Supp. 640, 646-47 (N.D. Ind. 1982), quoting Trans-American Van Services, Inc. v. Shirzad, 596 S.W.2d 587, 590-91 (Tex. Ct. App. 1980). In Fireman's Fund, the shipper had actually signed a statement which assigned a value to a shipment of art which was destroyed while in the carrier's custody. However, the court found this fact insufficient to grant the carrier's motion for summary judgment to limit liability to the agreed upon amount because the shipper had a limited knowledge of English and maintained that he thought the contract of carriage to be a "questionnaire," rather than a contract. Id. at 647-48. The court thought that a jury might believe that under those facts, the shipper "was not afforded [the] 'fair opportunity'" required by the released value doctrine. Id. at 647.

On the foregoing discussion of the released value doctrine, Hawaiian would seem to be fully liable for Uikirifi's losses because there has been no "absolute, deliberate and well informed" choice of limited liability by the passenger. No document declaring the value of the shipment or choosing the lower over the higher fare was signed, nor was there testimony that the availability of excess

valuation protection was pointed out to plaintiff or otherwise explained to him. However, in promulgating the applicable baggage liability regulations, the C.A.B. implicitly limited the extent to which passengers may rely on the released value doctrine to avoid an airline's attempt to limit liability.[11]

During the rulemaking process, the C.A.B. considered whether to adopt a proposal, the main feature of which was, that "passengers should be given oral and written notice of the carrier's liability policy, and asked to sign a 'statement of understanding' at check-in." ER-1374, supra, at 4. The Board rejected the proposal because it found the suggestion to be not "justified in light of the costs that would be involved." Id. at 6. The Board's action in effect is a rejection of one of the principal features of the released value doctrine since the suggested "statement of understanding" is simply the sort of waiver which would seem to be necessary for a carrier to demonstrate that the passenger had made an "absolute, deliberate and well informed choice." Another commenter expressed concern over allowing incorporation by reference of the liability rules. Id. at 5. The C.A.B. responded that:

> short-form ticketing was important to the efficiency of the air transportation system, and that there was no cost justification for replacing the tariff system with one of bulky individual contracts to be given out to each airline passenger. Baggage liability is just one of the many terms of the contract of carriage that are comprehended by that basic policy decision. The Board has recognized, however, the importance of baggage liability to the individual rules that are the subject of this proceeding.

---

[11] It is to be noted that Fireman's Fund involved air shipments, and not passenger accompanying baggage. In the air freight situation, we could not find comparable regulations regarding liability similar to 14 C.F.R. Parts 253 and 254. Thus the standard explicated in Fireman's Fund is not necessarily the same as that applicable in the context of accompanying baggage.

> The intent of the rules is to alert every passenger directly, in simple terms, of the carrier's limitation of liability, while making the details available through less costly means under the provisions of Part 253.

Id. This too implies that the Board had rejected an explicit waiver approach, since it would be a step toward undesirable "bulky" contracts, in favor of allowing the carriers to limit their liability through incorporation by reference.

On the other hand, the C.A.B. may also seem equivocal on the issue because in the same rulemaking, it also considered and refused to promulgate a rule requiring the airlines to carry excess valuation insurance.[12] In so doing, the C.A.B. noted that nevertheless it would appear "to be in the carriers' own interest to offer excess valuation insurance coverage, or at least to make sure that it is readily available" because the released-value doctrine was the very basis upon which an airline was allowed to limit its liability in the first place. ER-1374, supra, at 11. The Board then stated that its decision to not require excess valuation insurance was "not intended to preempt state courts on the issue of excess valuation coverage." Id.

Extending the import of this last statement of the Board's intent to its limits, one might argue that by not intending to preempt courts on the issue of excess valuation coverage, the C.A.B. must also have not intended to preempt application of the full scope of the "waiver" requirement. Such a view would ignore the Board's previously mentioned

---

[12] Although phrased in terms of "excess valuation insurance" the C.A.B.'s reference is clearly to the released value doctrine. The vocabulary merely reflects a different way of saying the same thing. The classical released value doctrine talked of rates being lower for released values. Insurance implies an extra charge for additional baggage. But whether phrased in terms of a discount for lower coverage or a premium for additional coverage, the economic effect of either is the same--one pays a lower rate for limited liability and a higher one for full protection.

intention to facilitate incorporation by reference without the costs associated with individual sign-offs and we refuse to adopt it. Instead, we believe that these somewhat conflicting expressions of intention may be harmonized without doing violence to each other. This can be done by requiring that a carrier make available excess valuation insurance, make this fact known to the travelling public in a notice at least as "conspicuous" as the ones which are provided under sections 253.5 and 254.5 on incorporation by reference and baggage liability limitations, and set out the outlines of the coverage provided. This much Hawaiian has done. The ticket itself contains a statement attached to the one on baggage liability limitations that the contract also incorporates by reference terms on the "availability of excess valuation coverage." Exhibit 4, Neru, supra. Also, Uikirifi's ticket jacket includes a statement that details the availability of excess valuation insurance on Hawaiian. The jacket reads ' "[c]harge for higher value declared [is] $1.00 per $100 (up to $2500)." Id., Exhibit 5; Uikirifi, supra, Exhibit 11. Since the excess valuation statement is of the same size and in the same location as the baggage limitation statement, in the Uikirifi case it is, like the notice of limited liability, sufficiently "conspicuous."[13] Accordingly, Uikirifi would not be entitled to recover any more than the contract ceiling, namely, $1250 per flight or $2500.[14]

---

[13] In the Neru case, the excess valuation notice is inadequate because of its location behind the ticket jacket flap. However, this makes no practical difference since Neru is already entitled to full recovery as explained above.

[14] The plaintiffs also contended that they were deprived of notice of the limitations and entitled to full recovery because Hawaiian was obligated to provide notice of the baggage liability limitations in Samoan. Without expressing agreement on the merits of this contention, we find it factually inappropriate. We are not impressed with Uikirifi's asserted inability to read English because he was able to respond to and fill out claim forms to a degree which demonstrates sufficient proficiency in English

55

## Conclusion

We conclude that the ticket and ticket jacket given plaintiff Neru did not comply with federal regulations allowing limitation of liability for loss of bags to $1250 and thus were inadequate to inform him or those limitations. Further, it would violate public policy to allow Hawaiian to disclaim all liability for loss of the bags. Therefore, Neru is entitled to recover the full amount of his loss --- $2,286.70.

In Uikirifi's case, Hawaiian likewise could not disclaim all responsibility for the contents of the bags. However, because the notice requirements of the federal regulatory scheme were complied with, he may only recover $2500 for loss of his bags --- that is, $1250 for each of the two flights he took. We also note that Uikirifi paid $129.00 in excess baggage fees on his September 17, 1987 flight. Since Hawaiian did not deliver a single one of these bags, we find this to be an additional item of damage due Uikirifi. He will accordingly have judgment for $2629.00.

It is so Ordered.

---

to understand the limitations of liability on the tickets. (Since we have awarded Neru full recovery, the issue does not arise in his case.)